SOUTHEASTERN MICHIGAN TRANSPORTATION AUTHORITY v
SECRETARY OF STATE

Docket No. 52719. Submitted November 12, 1980, at Lansing.—Decided March 5, 1981. Leave to appeal denied, 411 Mich 979.

The Southeastern Michigan Transportation Authority (SEMTA) brought an action for mandamus in the Court of Appeals requesting that an order be issued against implementation by the Secretary of State of a suspension of the collection of additional revenues from taxes imposed on motor vehicle registrations and transfers of title in the counties of Wayne, Oakland, and Macomb for public transportation purposes ordered following the issuance by the Attorney General of an opinion holding the enabling legislation unconstitutional and void. The Court of Appeals issued an *ex parte* order requiring the Secretary of State to collect the revenues, place them in an escrow account, and maintain records thereof until a final determination of the case on the merits was made. Subsequently the Boards of County Road Commissioners of the Counties of Wayne and Oakland and the County Road Association of Michigan moved to intervene as defendants, which motions were granted. *Held:*

1. SEMTA was created and granted taxing powers by the Metropolitan Transportation Authorities Act. The taxes in question and their collection and distribution are mandated by the same act.

2. The taxes authorized by the enabling statute do not fall under the "use" tax exception embodied in the statute because the exception does not encompass any tax on the use of an

REFERENCES FOR POINTS IN HEADNOTES
[1] 71 Am Jur 2d, State and Local Taxation § 93.
   73 Am Jur 2d, Statutes §§ 97, 98.
[2] 68 Am Jur 2d, Sales and Use Taxes § 171.
[3, 4] 16 Am Jur 2d (Rev), Constitutional Law § 129.
[5-8] 7A Am Jur 2d, Automobiles and Highway Traffic § 73.
   68 Am Jur 2d, Sales and Use Taxes § 169.
   71 Am Jur 2d, State and Local Taxation § 169.
[9, 10] 16 Am Jur 2d (Rev), Constitutional Law §§ 212, 219.
[10] 29 Am Jur 2d, Evidence § 127.

article but is limited to a tax which is supplementary or complementary to the sales tax.

3. The constitutional limitations on taxes used for transportation purposes are imposed in the aggregate, and as long as the taxes distributed to SEMTA under the enabling statute do not exceed ten percent of all the constitutionally earmarked taxes on motor vehicles and motor fuels the distribution provisions of the statute are not unconstitutional.

4. The enabling statute is not unconstitutional on its face, and thus the Secretary of State shall continue to collect the revenues and deposit them in the escrow account.

5. The constitution limits the uses of the revenues once collected and the distribution of the funds under the statute may be unconstitutional. Distribution from the escrow account shall not be made until the Legislature and the Department of Transportation take whatever action is necessary to assure that the distribution of revenues is consistent with constitutional limitations.

Mandamus granted.

1. TAXATION — STATUTORY INTERPRETATION — LEGISLATIVE DESIGNATIONS.

A court, in passing on the constitutionality of a tax statute, should look to the operation of the tax imposed rather than to the labels or descriptive words used to define the tax; the designation given a tax by the Legislature is entitled to be given great weight but is not controlling.

2. TAXATION — USE TAXES — WORDS AND PHRASES — CONSTITUTIONAL LAW.

The phrase "use tax" is a term of art which does not encompass any use of an article but is limited to a tax which is supplementary or complementary to a sales tax (Const 1963, art 9, § 9).

3. CONSTITUTIONAL LAW — JUDICIAL CONSTRUCTION.

Delegates to a constitutional convention are presumed to use words in the sense in which they previously have been used or judicially interpreted.

4. CONSTITUTIONAL LAW — AMENDMENTS TO CONSTITUTIONS — JUDICIAL CONSTRUCTION.

The proper meaning and intent underlying a constitutional amendment may be gleaned from the circumstances under which the amendment was written and the purpose sought to be accomplished where its meaning is ambiguous or is subject to alternative interpretations.

5. TAXATION — METROPOLITAN TRANSPORTATION AUTHORITIES ACT — DISTRIBUTION OF REVENUES — CONSTITUTIONAL LAW — STATUTES.

Distribution of revenues collected from taxes imposed on motor vehicle registration and transfer of title for public transportation purposes pursuant to the Metropolitan Transportation Authorities Act is limited by constitutional provisions in the aggregate to an amount which does not exceed ten percent of all of the constitutionally earmarked taxes on motor vehicles and motor fuels; it is not necessary that ninety percent of each of the taxes collected be spent for conventional highway purposes (Const 1963, art 9, § 9, MCL 124.416a[3]; MSA 5.3475[116a][3]).

6. TAXATION — TRANSPORTATION TAXES — CONSTITUTIONAL LAW.

Article 9, § 9 of the Michigan Constitution does not limit the amount of revenues which may be collected from taxes imposed on the sale or use of motor vehicle fuels or the registration of motor vehicles but limits the use of the revenues once collected.

7. TAXATION — TRANSPORTATION FUNDS — CONSTITUTIONAL LAW — STATUTES.

The funds of both the Southeastern Michigan Transportation Authority and the comprehensive transportation fund are subject to constitutional limitations on use (Const 1963, art 9, § 9, MCL 124.416a[3], 247.660b; MSA 5.3475[116a][3], 9.1097[10c]).

8. TAXATION — STATUTES — CONSTITUTIONAL LAW.

A statute is not rendered unconstitutional because those charged with its administration improperly administer it, and where distribution of tax revenues is improper the remedy is to prevent the impropriety of the distribution by appropriate judicial means.

9. STATUTES — JUDICIAL CONSTRUCTION — CONSTITUTIONAL LAW.

Statutes must be presumed to be constitutional, and where both a constitutional and an unconstitutional interpretation are possible the interpretation which would make the statute constitutional should be given.

10. STATUTES — PRESUMPTION OF CONSTITUTIONALITY — BURDEN OF PROOF.

A party challenging the constitutionality of a statute has the burden of overcoming the presumption of constitutionality.

*Downs, Zagaroli & Downs, P.C.,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Louis J. Caruso, Patrick McElmurry,* and *David L. Balas,* Assistants Attorney General, for defendant.

*John P. Cushman,* for County Road Association of Michigan.

*Bodman, Longley & Dahling* (by *Joseph A. Sullivan* and *Lloyd C. Fell),* for Wayne County Board of Commissioners.

*John D. Pirich* and *Leroy W. McEntee,* for Oakland County Road Commission.

Before: M. J. KELLY, P.J., and ALLEN and C. L. HORN,* JJ.

ALLEN, J. Is § 16a, 1976 PA 266, as amended by 1980 PA 89, MCL 124.416a; MSA 5.3475(116a), which authorizes the collection in Wayne, Oakland, and Macomb counties of a $2.50 motor vehicle registration fee and a $6 motor vehicle transfer of title fee for public transportation purposes in violation of Const 1963, art 9, § 9? On July 11, 1980, the Attorney General issued OAG 1980, No 5737 holding said section in conflict with the constitution and void. Upon receiving the Attorney General's opinion, the Secretary of State ordered all branch offices of the Secretary of State in Oakland, Wayne, and Macomb counties to cease collecting said taxes on July 12, 1980.

On July 21, 1980, plaintiff, Southeastern Michigan Transportation Authority (SEMTA), filed an original complaint for mandamus with the Court of Appeals, requesting a temporary restraining order against suspension of collection of said taxes

---

* Circuit judge, sitting on the Court of Appeals by assignment.

pending determination of the constitutional question.[1] On July 30, 1980, this Court issued an *ex parte* restraining order requiring defendant, Secretary of State, to collect the taxes pursuant to 1980 PA 89 and to place them in an escrow account keeping a record of the name, address, and the amount of tax paid, said order to remain in effect until final determination of the merits of this case. In September 1980, motions to intervene made by the Boards of County Road Commissioners of the Counties of Wayne and Oakland and the County Road Association of Michigan, intervening defendants, were granted.

Plaintiff SEMTA was created in 1967 by the Metropolitan Transportation Authorities Act, 1967 PA 204, MCL 124.401; MSA 5.3475(101). Originally it included six counties, but three counties opted out so that today the Authority includes only the counties of Wayne, Oakland, and Macomb. Taxing powers were granted SEMTA by 1976 PA 266 which added § 16a to the Metropolitan Transportation Authorities Act. MCL 124.416a; MSA 5.3475(116a). Section 16a mandated the imposition of "a tax of $2.50 on each vehicle for which a registration fee is collected by the Secretary of State" within the district, and "a tax of $6 upon the transfer of the title of a motor vehicle" within the district. The $2.50 and $6 taxes were to be collected by the Secretary of State, and the revenue therefrom was to be deposited in a separate account in the state treasury and, after deducting

---

[1] Prior to filing the action in the Court of Appeals, plaintiff filed a complaint for a writ of mandamus in the Circuit Court for Ingham County. Following a hearing on July 21, 1980, the circuit court dismissed the complaint on grounds that the court lacked jurisdiction to issue a writ of mandamus against a state official. See, however, MCL 600.4401; MSA 27A.4401. Instead of appealing the circuit court ruling, plaintiff commenced the instant action in the Court of Appeals.

collection expenses, was to be returned quarterly to SEMTA. When 1976 PA 266 was enacted, Const 1963, art 9, § 9 read:

"All specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after payment of necessary collection expenses, be used exclusively for highway purposes *as defined by law.*" (Emphasis supplied.)

In 1976, the Legislature substantially broadened the definition of highway purposes by enacting 1976 PA 297; MCL 247.660c; MSA 9.1097(10d) which defined public transportation, rapid transit vehicle, railroad car, and movement of people, as highway purposes. Thus, there is no question but that § 16a was constitutional when initially enacted.

However, two years later, in the fall of 1978, the Legislature approved House Joint Resolution F which amended Const 1963, art 9, § 9, to read:

"All specific taxes, *except general sales and use taxes* and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and to propel aircraft and on registered motor vehicles and aircraft shall, after the payment of necessary collection expenses, be used exclusively for transportation purposes as set forth in this section.

"Not less than 90 percent of the specific taxes, *except general sales and use taxes* and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after the payment of necessary collection expenses, be used exclusively for the transportation purposes of planning, administering, constructing, reconstructing, financing, and maintaining state, county, city, and village roads, streets, and

bridges designed primarily for the use of motor vehicles using tires, and reasonable appurtenances to those state, county, city, and village roads, streets and bridges.

"The balance, if any, of the specific taxes, *except general sales and use taxes* and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles, after the payment of necessary collection expenses; 100 percent of the specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel aircraft and on registered aircraft, after the payment of necessary collection expenses; and not more than 25 percent of the general sales taxes, imposed directly or indirectly on fuels sold to propel motor vehicles upon highways, on the sale of motor vehicles, and on the sale of the parts and accessories of motor vehicles, after the payment of necessary collection expenses; *shall be used exclusively for the transportation purposes of comprehensive transportation purposes as defined by law."* (Emphasis supplied.)

The above section was approved by the voters in the November 1978 election and is the present mandatory language of article 9, § 9.

In 1979, § 16a was amended to provide that the taxing authority previously conferred would expire on April 15, 1980, unless the transportation system of the City of Detroit had been merged with SEMTA by April 15, 1980. On April 14, 1980, just one day before the expiration date of § 16a as provided in 1979 PA 68, the Legislature enacted 1980 PA 89.

That statute amended § 16a to read in relevant part:

"(2) * * *:
"(a) A *use* tax of $2.50 on each vehicle for which a

registration fee is collected by the secretary of state
* * *.

"(b) A *use* tax of $6.00 upon the transfer of the title
of a motor vehicle when the application for a certificate
of title, except a salvage certificate of title, is submitted
in a county which is part of a transportation district.

*     *     *

"(3) The revenue from the taxes shall be deposited in
a separate account in the state treasury and all of the
revenue except that used for the necessary expenses
incurred in collecting the taxes shall be returned on a
quarterly basis to the authority in which a transporta-
tion district has been created." (Emphasis supplied.)

The amendment also added a new provision to the
effect that 20% of the revenues so collected would
be credited to cities, villages, and townships within
the district to meet the requirements of 1978 PA
444, § 10-l(6), MCL 247.660-l; MSA 9.1097(10m),
and 80% would be credited to SEMTA.

OAG 1980, No 5737 (July 11, 1980) held that
§ 16a was unconstitutional on two grounds: (1) the
taxes imposed were not "use taxes" falling within
the exception contained in Const 1963, art 9, § 9,
and (2) there was an absence of any requirement
that the revenue from the taxes imposed be used
in accordance with the limitations of Const 1963,
art 9, § 9.

"Accordingly, changing the name of the taxes in
question to 'use taxes' does not remove the revenue
collected from the expenditure restrictions contained in
Const 1963, art 9, § 9, *supra*. To the extent the specific
taxes fall upon motor vehicles, the taxes come within
the designated operation and restricted uses of Const
1963, art 9, § 9, and not within the types of specific
taxes, *i.e.,* general sales and use taxes or regulatory
fees, categorically excepted therefrom. 2 OAG, 1960, No
3481, p 1 (January 2, 1960).

*     *     *

"Const 1963, art 9, § 9, *supra,* requires that not less than 90 percent of all the specific taxes in question, after payment of necessary collection expenses, be used exclusively for the six transportation purposes set forth in Const 1963, art 9, § 9, *supra,* with the balance of the specific taxes to be used for the comprehensive transportation purposes, as defined by law.

"However, 1967 PA 204, § 16a, *supra,* does not require that revenue from the specific taxes will be used in accordance with the requirements of Const 1963, art 9, § 9, *supra.* Instead, § 16a, *supra,* of said act requires only that the revenue from the taxes be deposited in a separate account in the state treasury, with all the revenue being returned to the metropolitan transportation authority on a quarterly basis, with the exception of necessary collection expenses."

According to the Attorney General, the constitutional language "not less than 90 percent of the specific taxes" means not less than 90 percent of *each* specific tax must be allocated for conventional highway purposes and, accordingly, since § 16a allocates 100 percent of the designated taxes for public transportation purposes, the section, on its very face, violates the limitations imposed by Const 1963, art 9, § 9. In rebuttal, plaintiff contends that the 90%-10% language refers to the *aggregate or total* of all constitutionally earmarked taxes and that as long as the total of the taxes collected under § 16a does not exceed 10% of the aggregate of all specific taxes constitutionally earmarked, no constitutional violation occurs. A third ground for the unconstitutionality of § 16a surfaced upon receipt of the brief from intervening defendant County Road Commissioners of Oakland County, *viz.:* that because there is not and cannot be any statutory mechanism to identify and control the amount of § 16a taxes collected and disbursed the collections at times will be mathemati-

cally within the 90%-10% constitutional limitation and at other times will be mathematically in excess of the constitutional limitation. Lastly, the Attorney General asserts that even if the 90%-10% split required by the constitution applies in the aggregate, as contended by plaintiff, statistical data now available discloses that less than 90% of the aggregate is available for conventional highway purposes. The four grounds for voiding § 16a are examined *seriatim*.

## I

Plaintiff argues that because the taxes authorized by § 16a are taxes for the *use* of a vehicle and because the Legislature in enacting 1980 PA 89 added the word "use" to the description of the taxes imposed, the taxes fall within the excepting language, "except general sales and use taxes and regulatory fees", in each of the first three paragraphs of article 9, § 9 of the constitution. We do not agree.

The designation given by the Legislature to a tax is not controlling, although entitled to be given great weight. *Banner Laundering Co v State Board of Tax Administration,* 297 Mich 419, 429; 298 NW 73 (1941). In passing upon the constitutionality of a statute, the court looks to the operation of the tax imposed rather than to the labels or descriptive words used to define the tax. *Detroit v Murray Corp of America,* 355 US 489, 492; 78 S Ct 458; 2 L Ed 2d 441 (1958). Both in Michigan and other jurisdictions "use tax" is a term of art which does not encompass any use of an article but is limited to a tax which is supplementary or complementary to the sales tax.

"The use tax was enacted for the purpose of levying

and collecting a specific tax for the privilege of using, storing or consuming tangible personal property. *Goebel Brewing Co v State Board of Tax Administration,* 306 Mich 222. It is complementary to the sales tax (Act No 167, Pub Acts 1933, as amended [Comp Laws Supp 1940, § 3663-1, Stat Ann § 7.521 *et seq.]). * * * This act is designed to impose an excise tax on the use, storage or consumption of tangible personal property brought into the State in interstate commerce, after it has come to rest in this State." *Western Electric Co v Dep't of Revenue,* 312 Mich 582, 596; 20 NW2d 734 (1945).

The term "use tax" is similarly described in 68 Am Jur 2d, Sales and Use Taxes, § 175, pp 240-241, and Anno: *Constitutionality, construction, and application of general use tax or other compensating tax designed to complement state sales tax,* 129 ALR 222. Likewise, it is the definition given the term by the United States Supreme Court. *Miller Brothers Co v Maryland,* 347 US 340, 343; 74 S Ct 535; 98 L Ed 744 (1954). Article 9, § 9 of the present constitution is a revision of article 10, § 22 of the constitution of 1908. That section was proposed by initiative petition and was adopted November 8, 1938. The first sentence provided that all taxes imposed on gasoline or like fuels and on all motor vehicles in this state shall be "used exclusively for highway purposes * * *". The second sentence provided:

"The provisions of this section shall not apply to the *general sales tax, the use tax,* the fees and taxes collected under the auto theft and operators' and chauffeurs' license laws * * *."

From the foregoing history of the constitutional amendment pertaining to taxes on gasoline and motor vehicles and from the virtually unanimous

agreement in other jurisdictions that a use tax is a tax complementary to the sales tax, we are convinced that the words "general sales and use taxes" appearing in Const 1963, art 9, § 9, did not encompass any tax on the use of an article or product but instead were limited to taxes which are complementary to the sales tax. We also observe that delegates to a constitutional convention are presumed to use words in the sense in which they previously have been used or judicially interpreted. *Hall v Ira Twp,* 348 Mich 402; 83 NW2d 443 (1957). Any other interpretation of the statute and constitutional provision would open the door to wholesale circumvention of constitutional provisions by the simple expedient of allowing the Legislature to call a tax involving the use of an article a use tax.[2]

## II

Because § 16a(3) distributes 100% of the taxes levied under § 16a(2)(a) and (b) for mass transportation purposes, defendants claim that § 16a(3) facially violates Const 1963, art 9, § 9, which provides that not more than 10% of such taxes may be used for mass transportation purposes.

"(3) The revenue from the taxes shall be deposited in a separate account in the state treasury and all of the revenue except that used for the necessary expenses incurred in collecting the taxes shall be returned on a quarterly basis to the authority in which a transportation district has been created." MCL 124.416a(3); MSA 5.3475(116a)(3).

[2] Our decision in issue I makes it unnecessary to decide whether 1980 PA 89 violates the constitutional requirement that no law embrace more than one object which shall be expressed in its title. Defendants argued that if the taxes at issue were indeed use taxes the bill's title was not expressive of its purpose and scope.

Defendants further contend that once the distribution section (subsection [3]) is found invalid the two subsections which impose the tax of $2.50 and $6 are invalidated because they are so inextricably related and closely bound together that invalidity of the distribution formula will destroy all of § 16a.

The $2.50 fee and $6 fee imposed under subsections 2(a) and 2(b) yield approximately $13.4 million per year. See *infra.* All constitutionally earmarked taxes on automobiles and fuel (including the SEMTA taxes) yield approximately $703 million dollars per year. Thus, § 16a does not come close to exceeding the 10% constitutional limitation unless Const 1963, art 9, § 9, is construed to require 90% of *each* specific tax, rather than 90% of the aggregate of the constitutionally earmarked taxes, to be earmarked for conventional highway purposes. This is precisely what defendants contend, *viz.:* that any statute which on its face distributes more than 10% of such taxes for comprehensive transportation purposes is unconstitutional.

Plaintiff disputes defendants' interpretation claiming that it too narrowly interprets legislative intent. According to plaintiff, the 90%-10% constitutional limitation does not apply to *each* tax but applies to the aggregate or total of all of the constitutionally earmarked taxes on motor fuels and vehicles. Under this interpretation, only 90% of the aggregate must be used for conventional highway purposes. The aggregate 90% could be 100% of one tax and zero percent of another so long as the aggregate is not more than 10% for mass transportation purposes. In support of this interpretation, plaintiff relies, *inter alia,* on that portion of the language of article 9, § 9 emphasized

in footnote 3 below and argues that such language speaks in the plural and aggregate.[3]

We do not find the emphasized words determinative. The word "all" can mean both aggregate or "each". Black's Law Dictionary (4th ed), p 98. The words "all" and "each" are generally synonymous. 3A CJS, p 244, 3 Words & Phrases, All, p 220, 14 Words & Phrases, Each, p 4. Where the meaning of a constitutional amendment is ambiguous or is subject to alternative interpretations, its proper meaning and intent may be gleaned from the circumstances under which the amendment was written and the purpose sought to be accomplished. *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), *Giannotta v Governor,* 71 Mich App 15, 19-20; 246 NW2d 357 (1976). In 1976, when the Legislature broadened the definition of highway purposes to include public transportation, rapid transit vehicles, people movement, and railroad cars—this being permitted under article 9, § 9, as it then read—road contractors, suppliers of road building machinery and equipment, and manufacturers of automobiles and auto parts became alarmed that unless article 9, § 9 was amended massive appropriations for mass transportation would be made from the earmarked taxes which traditionally had been used for building and maintaining highways. Conversely, proponents of mass transportation

[3] "*All specific taxes,* * * * imposed directly or indirectly * * * on registered motor vehicles and aircraft shall * * * be used exclusively for transportation purposes as set forth in this section.

"Not less than 90 percent *of the specific taxes* * * * shall * * * be used exclusively for the transportation purposes of planning, administering, constructing, reconstructing, financing and maintaining state, county, city, and village roads, streets and bridges * * *.

"The balance, if any, *of the specific taxes* * * * shall be used exclusively for the transportation purposes of comprehensive transportation purposes as defined by law."

moved to have even greater appropriations made from the earmarked funds.

By placing a ceiling on the total or aggregate amount of earmarked revenues which could be diverted to public transportation and similar purposes, the fears of the road building and automobile interests could be allayed. This is precisely what House Joint Resolution F did. It placed a top limit on the amount of money which could be diverted from conventional highway purposes to comprehensive highway purposes. The important point, for purposes of this case, is that the competing interests were concerned with total dollar amounts. They compromised their differences by placing limits in aggregate amounts. Based on the circumstances under which House Joint Resolution F was written and approved by the people, we conclude that article 9, § 9 imposes its limitations in the aggregate and that as long as the SEMTA taxes distributed under § 16a(3) do not exceed 10% of all of the constitutionally earmarked taxes on motor vehicles and motor fuels, § 16a(3) is not unconstitutional. In our opinion, Const 1963, art 9, § 9, as amended, does not require that 90% of each tax governed by that section be spent for conventional highway purposes.

Our interpretation of the statute is reinforced by another consideration. If, as claimed by the Attorney General, the distribution provision of each tax on motor vehicles or motor fuels must provide that 90% of the amounts collected be expended for road building purposes, the Legislature's power to appropriate for public and mass transportation purposes is severely curtailed. It would mean, for example, that in order to obtain $2.50 and $6 for mass transportation, the tax imposed must be $25

and $60 of which 10% would be available for mass transportation purposes. Such an interpretation is unrealistically restrictive on the Legislature and unfair to the three-county metropolitan district area which most needs public transportation facilities.

## III

Intervening defendants assert that even if this Court accepts the aggregate theory § 16a still cannot pass constitutional muster. In order to clearly understand this claim, it is necessary to explain in some detail the various funding mechanisms. The SEMTA taxes authorized by 1980 PA 89 are collected on a daily basis in a three-county area and, under § 16a(3), are deposited in a separate account in the state treasury, and all the revenue, less expenses of collection, is distributed to plaintiff on a quarterly basis. According to figures supplied by the Bureau of Finance of the Department of Transportation and set forth in chart A of the Attorney General's brief of September 10, 1980, the net amount paid SEMTA in fiscal year 1978-79 was approximately $13,375,000. All other earmarked taxes on motor vehicles and motor fuels are also collected on a daily ongoing basis for all 83 counties in Michigan and are deposited in the Michigan Transportation Fund (MTF). The MTF was established by § 10 of 1978 PA 444, an act amending 1951 PA 51. MCL 247.660; MSA 9.1097(10). Section 10c of the statute establishes a comprehensive transportation fund (CTF). MCL 247.660b; MSA 9.1097(10c). Under a formula set forth in § 11, MCL 247.661; MSA 9.1097(11), 8.03% of the funds in the MTF is appropriated to the

CTF.[4] According to figures supplied by the Bureau of Finance of the Department of Transportation for the fiscal year 1978-79 and set forth in charts B and C of the Attorney General's brief, *supra,* the MTF received approximately $703,689,000, out of which there was paid into the CTF $58,429,000. As noted earlier in this opinion, the SEMTA taxes minus costs of collection yield $13,375,000, or approximately $13.4 million. When this amount is added to the $703,689,000 deposited in the MTF, the *total amount of constitutionally earmarked taxes* subject to Const 1963, art 9, § 9, is $717,064,-000 of which $13,375,000 was distributed to SEMTA as required by § 16a(3), and $58,429,000 was distributed for mass transportation purposes from the CTF. Thus, the *total amount of constitutionally earmarked* revenues legislatively made available for fiscal 1978-79 for mass transportation purposes was $71,804,000.

From the foregoing recitation of facts, two problems surface. First, the problem of uncertainty caused by the existence of two funds. Second, the fact that the total appropriations for comprehensive transportation purposes ($71,804,000) exceed the 10% constitutional limitation ($71,706,400) by $98,000. In terms of percentages for fiscal 1978-79, 89.98% was available for conventional highway purposes and 10.02% was available for comprehensive transportation purposes. Stated another way, the constitutional limitation was exceeded by a

---

[4] Under § 10, 46.7% of the MTF is first appropriated to the Department of Transportation and placed in a state transportation department fund (STDF). Under § 11(1)(b), 17.78% of the STDF is distributed to the state treasury to be placed in the CTF. 17.78% of the 46.7% is 8.3%. Thus, 91.7% of the total MTF is appropriated for conventional highway purposes and 8.3% is appropriated for comprehensive transportation purposes. The $58,429,000 raised by SEMTA taxes are in addition to the $703,689,000 raised by all other constitutionally earmarked taxes on motor vehicles and motor fuels and placed in the MTF.

mere .02%. We will discuss the problems separately.

Because two separate funds are involved, each deriving their revenue from separate sources and each administered by different agencies, it is impossible to ascertain until the end of the fiscal year whether the constitutional limitation has been exceeded. As gasoline prices rise, driving declines, and smaller engines become more popular, the yield from gas and weight taxes deposited to the credit of the MTF will decrease. At the same time, the number of cars registered and titles transferred in the three-county area might increase. Given the vagaries of the market place and the lack of a single statutory mechanism covering both funds, it is altogether possible that in some years or quarter years the constitutional limitation will be exceeded and at other times it will not. The result, according to intervening defendants, is that 1980 PA 79 will be constitutional some of the time and unconstitutional the rest of the time.

We agree that the existence of two funds results in a situation where the sums distributed therefrom will at times exceed the constitutional limitation and at other times will not exceed the limitation. We further agree that it would be far better if there were a single fund into which all motor vehicle and fuel taxes could be placed and from which disbursements not exceeding 10% of the total could be made for comprehensive transportation purposes. But we do not agree that because of the existing two-fund situation 1980 PA 89 is unconstitutional and that the revenues derived therefrom which are now held in escrow should be returned. We reach this conclusion for several reasons.

First, article 9, § 9, is not a limitation on the *amount* of taxes which may be collected. Instead, it is a limitation on the *use* of the revenues once they are collected. At the point at which the $2.50 registration fee and the $6 transfer fee are collected, there is no violation of the constitution. The violation, if any, occurs only when the distribution of SEMTA funds *combined with* the distribution of CTF funds, as prescribed by 1978 PA 444, exceeds 10% of the earmarked revenues in both the SEMTA fund and MTF fund. Hence, 1980 PA 89 is not unconstitutional, but distribution of funds collected under it may be. Likewise, distribution of funds out of the CTF may be unconstitutional.[5] Both funds are subject to the limitations on the *use* of money set forth in article 9, § 9. But a statute is not rendered unconstitutional because those charged with its administration may improperly administer it.

"The Court will not declare as unconstitutional a statute constitutional by its terms yet unconstitutionally applied. Maladministration of a law does not make the law unconstitutional. *Cummings v Merchants' Nat Bank of Toledo,* 101 US 153, 161, 25 L Ed 903 (1880); *Kortz v Ellingson,* 181 F Supp 857 (D Colo 1960)." *Fell v Armour,* 355 F Supp 1319, 1334 (MD Tenn, 1972).

If distribution of funds is improper, the remedy is not to declare the statute under which the funds are collected unconstitutional but to prevent by some appropriate judicial means the improper distribution.

---

[5] Since distribution of CTF funds has already been made for fiscal 1979-1980, which ended October 1, 1980, it is that portion of SEMTA funds now held in escrow for that year which would be in violation of the constitutional limitation. But for future fiscal years, commencing fiscal 1980-1981, any sums exceeding the 10% limitation could be withheld from either the SEMTA fund, or the CTF fund, or both.

Second, the SEMTA taxes do not exceed the constitutional limit of 10%. It is only when the $58.4 million of earmarked funds in the CTF are added to the $13.4 million SEMTA taxes that a violation occurs. Statutes must be presumed to be constitutional, and the party challenging a statute has the burden of overcoming that presumption. *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337, 343; 245 NW2d 1 (1976). If a statute can be given two different interpretations, one of which is constitutional and the other unconstitutional, it should be given the interpretation which makes it constitutional. *State Bar of Michigan v City of Lansing,* 361 Mich 185; 105 NW2d 131 (1960).

Third, the only statistics available are for fiscal 1978-79, a year in which distribution has been made. No statistics are available for fiscal 1979-80 which ended October 1, 1980, and is the year in which the Attorney General issued opinion OAG 1980, No 5737 (July 11, 1980). It was not until July 30, 1980, that SEMTA collections were placed in escrow. Thus we have the anomalous situation of being asked to declare 1980 PA 89 unconstitutional on grounds that the 10% constitutional limitation is exceeded for a fiscal year when we don't even have figures available disclosing that the limitation was exceeded. Furthermore, the accuracy of the statistical data appearing in charts A-C of the Attorney General's brief is contested by plaintiff. But assuming, *arguendo,* their accuracy and, for hypothetical purposes, assuming too that fiscal 1979-80 and fiscal 1980-81 collections would be proportionally the same, the difference between the constitutional mandate of 90% and the 89.98% is so small as to make a return of the excess sum collected from each taxpayer impractical. The ex-

cess is less than 1% of each $2.50 registration fee and $6 title transfer fee paid.

Accordingly, we find that 1980 PA 89 is not unconstitutional on its face. The Secretary of State shall continue to collect the fees imposed under the statute. However, those fees shall be placed in the escrow account heretofore established by the order of this Court. Disbursements from the escrow account shall not be made until the Legislature and Department of Transportation take whatever action is necessary to assure that no more than 10% of the two funds is distributed for comprehensive transportation purposes consistent with article 9, § 9. There is precedent for such action:

"During the interim period:

"1) the Legislature and the Commissioner of Insurance may take whatever action they deem necessary to remedy the due process deficiencies articulated *supra* * * *." *Shavers v Attorney General,* 402 Mich 554, 610; 267 NW2d 72 (1978).

It is not the province of this Court to dictate to the Legislature what specific action to take. For example, the Legislature might amend 1980 PA 89 and 1978 PA 444 so that there would be one fund into which the SEMTA taxes and all other article 9, § 9 earmarked taxes would be placed and from which disbursements not exceeding 10% would be made. Other solutions of the problem are available, but each involves policy decisions which can be made only by the Legislature. In the interim, the fees shall continue to be collected.

Writ of mandamus granted. No costs, a question of public interest being involved.