ELIAS BROTHERS RESTAURANTS, INC v TREASURY DEPARTMENT

Docket No. 101226. Argued March 7, 1996 (Calendar No. 17). Decided July 2, 1996.

Elias Brothers Restaurants, Inc., owner and operator of a facility for the production of food for its company-owned and franchised Big Boy restaurants (the Commissary), claimed an industrial processing use tax exemption under MCL 205.94(g); MSA 7.555(4)(g). The Department of Treasury allowed an exemption only with regard to the equipment and supply costs attributable to the franchised restaurants, but denied an exemption for the proportionate costs attributable to company-owned stores because they were costs incurred in the preparation of food and beverages by a retailer for retail sale. The Tax Tribunal canceled the tax assessments. The Court of Appeals, DOCTOROFF, C.J., and McDONALD and R. R. LAMB, JJ., affirmed in an unpublished opinion per curiam (Docket No. 151490). The department appeals.

In an opinion by Justice WEAVER, joined by Chief Justice BRICKLEY, and Justices LEVIN and RILEY, the Supreme Court held:

Elias Brothers is entitled to the industrial processing exemption for the cost of equipment and supplies used by the Commissary in production for company-owned restaurants.

1. The department's assessment contravenes the clear and fundamental legislative intent to avoid a pyramiding of sales and use taxes. Sales and use tax provisions are complementary and supplementary. Under the Sales Tax Act, the right to an exemption is not decided by the type of business a taxpayer is engaged in, but rather upon the use a customer makes of the product. In this case, both company-owned and franchised restaurants purchase almost all wholesale items from the Commissary at the same price and for subsequent retail sale to patrons, who constitute the last or final buyers. Consequently, Elias Brothers is not a retailer and does not make a sale at retail when the Commissary produces goods and transfers them to company-owned restaurants.

2. The industrial processing exemption does not depend on the nature or existence of a transaction between the processor and the retailer; rather, it depends on the use to which the equipment is put, not the character of the equipment-owner's business. When

Elias Brothers transfers to company-owned restaurants, it uses the Commissary's equipment in a manner covered by the industrial processing exemption, rather than the restaurant food preparation exclusion. Because the Commissary is an entirely separate and distinct operation, the exemption applies to its equipment actually engaged in the manufacturing of a product for eventual resale to company-owned restaurants. The distinct, identifiable, and clearly severable activity of the Commissary entitles Elias Brothers to an industrial processing exemption for equipment and supply costs associated with production for company-owned restaurants.

Affirmed.

Justice CAVANAGH, joined by Justice MALLETT, concurring in part and dissenting in part, stated that the industrial processing exemption, which is to be strictly construed against the taxpayer, should be apportioned in accordance with the nature of the activity in the plaintiff's separate departments. The primary focus of analysis should be on the difference between food and beverage preparation and industrial processing, with the secondary focus on the difference between wholesale and retail.

The use tax statute excepts from the industrial processing exemption retail food and beverage preparation and sales to a person performing a service who does not act as an industrial processor while performing the service. In deciding whether a taxpayer is entitled to the industrial processing exemption, the focus should be on the statutory distinction between manufacturing-type processing and service activity.

In this case, rather than viewing the Commissary as a single entity, it should be broken down into its various departments, with each department being analyzed separately. The restaurant service of providing food preparation does not become industrial processing just because it is done in a different location. The form, composition, or character of the starting product must be changed into a new product.

Justice BOYLE took no part in the decision of this case.

*Richard L. Hamlyn* for the petitioner-appellee.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Michael R. Bell* and *Ross H. Bishop*, Assistant Attorneys General, for the respondent-appellant.

WEAVER, J. Petitioner-appellee, Elias Brothers Restaurants, Inc., owns the Big Boy restaurant chain. Twenty-five percent of the Big Boy restaurants are company owned and operated. The remaining seventy-five percent are franchised. Food for both company-owned and franchised restaurants is produced at a facility called the Commissary, which Elias Brothers owns and operates.

We are asked to determine whether the cost of equipment and supplies used at Elias Brothers' Commissary for production of food and beverages for its company-owned restaurants is exempt from use tax.[1] We find that Elias Brothers is exempt from use tax for these costs.[2]

The Department of Treasury allowed Elias Brothers' industrial processing exemption claim only with regard to the equipment and supply costs attributable to its franchised restaurants.[3] The department denied

---

[1] Michigan Use Tax Act, 1937 PA 94, MCL 205.91 *et seq.*; MSA 7.555(1) *et seq.* The Use Tax Act, as amended, is an "excise" or "privilege" tax that covers transactions not subject to the general sales tax. *Tercheck* v *Treasury Dep't*, 171 Mich App 508, 510; 431 NW2d 208 (1988). Use tax is imposed on the privilege of "using, storing, or consuming tangible personal property" in Michigan. MCL 205.93(1); MSA 7.555(3).

[2] While the partial dissent claims to agree with this Court's disposition of the case, the following statement by the partial dissent seems to call for a remand to allow the trial court to make more detailed findings of fact:

What the Department of Treasury and the majority have failed to address is whether all the instant taxpayer's activities are really "changing the form, composition, or character" of the food products with which it starts into something different, as required by the statute. [*Post* at 163.]

[3] Elias Brothers claimed an exemption under MCL 205.94(g); MSA 7.555(4)(g) of the Use Tax Act for the entire cost of the Commissary's production equipment and related supplies. MCL 205.91 *et seq.*; MSA 7.555(1) *et seq.* See full text, *post* at 149.

an exemption for the proportionate cost of equipment and supplies attributable to company-owned stores. It claimed such cost was incurred in the "preparation of food and beverages by a retailer for retail sale,"[4] which is specifically excluded from the industrial processing exemption.

In response to the department's assessment, Elias Brothers filed a use tax assessment appeal.[5] The Tax Tribunal canceled the tax assessments by the department and found that Elias Brothers could claim an industrial processing exemption with respect to the cost of the food processing equipment and related supplies attributable to production of goods for company-owned restaurants.

The department appealed the Tax Tribunal's opinion in the Court of Appeals. In an unpublished opinion per curiam, the Court of Appeals affirmed.[6]

We hold that Elias Brothers is entitled to an industrial processing exemption for the cost of equipment and supplies used by the Commissary and attributable to company-owned restaurants. Accordingly, we affirm the decision of the Court of Appeals.[7]

---

[4] MCL 205.94(g)(i); MSA 7.555(4)(g)(i).

[5] The appeal was heard on December 18, 1991, by the Michigan Tax Tribunal, and its decision was filed on April 6, 1992. This case actually involves two distinct assessments, one for May 1, 1981, through December 31, 1984, for $19,079 plus interest (Docket No. 112177), the second, from January 1, 1986, through June 30, 1989, for $167,659 plus a penalty of $7,573 plus interest (Docket No. 144938).

[6] Issued October 10, 1994 (Docket No. 151490).

[7] Because we find that Elias Brothers is exempt from use tax on the portion of equipment used to produce food and beverages for company-owned stores under the industrial processing exception of the Use Tax Act, we do not address the issue of apportionment.

I

The Commissary is a 250,000 square foot food processing and distribution facility located in Warren, Michigan. The Commissary produces virtually all the food and beverages prepared and ultimately sold to consumers at both company-owned and retail restaurants.[8] The food-processing equipment used by the Commissary is of a type and size not found in a typical restaurant, but in a food-processing business that sells to retail establishments.

The department concedes that Elias Brothers is an industrial processor with respect to the Commissary's production for franchised restaurants.

Elias Brothers treats the Commissary as a distinct operation and profit center, separate from its company-owned restaurants. It is physically separate and distinct from any individual restaurant. Elias Brothers maintains separate billing records, income statements, and asset listings for the Commissary.

The Commissary's internal procedures and operations are the same both for company-owned and franchised restaurants. Its ordering, processing, handling, delivery, invoicing, billing, and sales procedures are identical for company-owned and franchised restaurants. The two types of restaurants pay the same price for the food and beverages processed by the Commissary.

The department asserts that Elias Brothers cannot claim an industrial processing exemption when it produces food and beverages at the Commissary and

---

[8] Neither party provided this Court with a copy of a franchise agreement, which would determine the degree, if any, to which franchisees are free to purchase food and beverages from wholesalers other than the Commissary.

then transfers them to customers in company-owned restaurants. According to the department, when Elias Brothers "sells" or transfers to itself, it is merely a "retailer" preparing its own food for retail sale and, therefore, is specifically excluded from the industrial processing exemption.

II

Whether the cost of equipment and supplies used by the Commissary attributable to company-owned restaurants is exempt under the "industrial process-ing" exemption or excluded from the exemption by the restaurant food preparation exclusion, as the "preparation of food and beverages by a retailer for retail sale," both contained in § 4(g)(i) of the Use Tax Act, is a question of statutory interpretation.

As currently written, § 4(g)(i) provides, in relevant part:

> The tax levied does not apply to the following:
>
> *        *        *
>
> (g) Property sold to the following:
> (i) An industrial processor for use or consumption in industrial processing . . . . *Industrial processing does not include . . . the preparation of food and beverages by a retailer for retail sale.* As used in this subdivision, "indus-trial processor" means a person who transforms, alters, or modifies tangible personal property by changing the form, composition, or character of the property for ultimate sale at retail or sale to another industrial processor to be further processed for ultimate sale at retail.[9]

---

[9] MCL 205.94(g)(i); MSA 7.555(4)(g)(i) (emphasis added). This provi-sion became effective on July 24, 1987, as 1987 PA 141, midway between the two assessments at issue. Earlier, § 4(g) provided, in relevant part:

The tax levied shall not apply to:

Because tax exemptions are disfavored, the burden of proving entitlement to an exemption rests on Elias Brothers, the party asserting the right to the exemption. *Tercheck v Treasury Dep't*, 171 Mich App 508, 510-511; 431 NW2d 208 (1988). While we recognize that tax exemptions are strictly construed against the taxpayer because exemptions represent the antithesis of tax equality, we interpret statutory language according to common and approved usage,[10] unless such construction is inconsistent with the manifest intent of the Legislature.[11]

Understanding the purpose of, and the distinction between, the industrial processing exemption and the restaurant food preparation exclusion is crucial to the resolution of the controversy before this Court. Because the act fails to define key terms within the statute, and because the application of the statute to the facts presented is ambiguous, it is necessary to

---

\*          \*          \*

(g) Property sold to a person for use or consumption in industrial processing. Industrial processing shall not include . . . the preparation of food and beverages by a retailer for retail sale. [MCL 205.94; MSA 7.555(4), as amended by 1984 PA 288, § 1, effective December 20, 1984.]

The Court of Appeals based its determination on the statute as amended in 1987. This Court bases its opinion on the amended language because neither party contests its use and because the department conceded that Elias Brothers' Commissary is an "industrial processor" as defined by the amended language. The question before this Court is whether Elias Brothers is an industrial processor engaged in industrial processing, or is a mere retailer, when its Commissary processes goods for company-owned stores.

[10] MCL 8.3a; MSA 2.212(1).

[11] MCL 8.3; MSA 2.212.

ascertain the legislative intent behind the industrial processing exemption.[12]

The act does not define the terms "retailer" or "retail sale." Neither does it explain the distinction between industrial processing and the mere act of food and beverage "preparation," which falls under the restaurant food preparation exclusion.[13]

Having no statutory definition of "retailer," the department has broadly defined the term to include "all persons who sell to the last or final buyer, user or consumer."[14] Such administrative interpretations are accorded deference. However, the department's definition of retailer, as applied in this case, would

---

[12] The fundamental role of statutory construction is to ascertain legislative intent. 21 Michigan Law & Practice, Statutes, § 82, pp 82-86.

[13] The partial dissent cites the following case to explain what it perceives as an inherent difference between manufacturing and restaurant food preparation: *Phillips Harborplace, Inc v State Dep't of Assessments & Taxation*, 65 Md App 461, 465-468; 501 A2d 92 (1985), *post* at 164-165. In discussing this case, however, the partial dissent neglects to mention the following unique policy objectives of the Maryland Legislature, as interpreted by the Maryland Court of Special Appeals:

> To grant an exemption in order to induce a manufacturer to operate in Maryland—a manufacturer who might conduct its business anywhere—serves the policy underlying § 9A(c)(1). To grant that exemption to a restaurant that must in any case operate where its patrons are to be found—here, in Baltimore—does not serve that purpose . . . . [*Id.* at 469.]

This interpretation of legislative intent illustrates the danger of imposing another jurisdiction's interpretation of its own statute on Michigan's industrial processing exemption. It also exemplifies how the distinction between manufacturing and preparation turns on considerations other than common sense and an inherent difference in processes.

Arguably, the language and title of Michigan's industrial *processing* exemption evidences a legislative intent to induce a broader range of industry, manufacturers as well as processors, to operate in this state. Furthermore, Michigan's restaurant food preparation exclusion does not subject all restaurant food preparation to use tax, but only that preparation done by a "retailer" for "retail sale." See full text *supra* at 149.

[14] 1979 AC, R 205.6.

unfairly broaden the scope of the restaurant food preparation exclusion[15] and, ultimately, contravene legislative intent, as shown below.

The industrial processing exemption is, in part, the product of a targeted legislative effort to avoid double taxation of the end product offered for retail sale or, in other terms, to avoid "pyramiding the use and sales tax."[16] Pyramiding occurs when both use and sales taxes are imposed on the production and sale of retail goods. A 1987 Senate Fiscal Agency bill analysis described the purpose of the industrial processing exemption as follows:

> [I]f the end product is taxed, the components used or consumed in its production are not taxed so that the product is not subject to double taxation.[17]

If this Court were to apply the department's definition literally, Elias Brothers would be subject both to sales and use tax on each food item or beverage sold at the company-owned restaurants. However, production costs and sales to franchisees would not be subject to such tax "pyramiding" despite the identical prices charged and procedures employed by the Commissary, such as in production, invoicing, and delivery. Because there was no showing that Elias Brothers would gain an unfair competitive advantage or a windfall if exempted, the department's assessment appears to contravene the clear and fundamental leg-

---

[15] See n 23 and corresponding text.

[16] *Int'l Research & Development Corp v Revenue Dep't*, 25 Mich App 8, 13; 181 NW2d 53 (1970). In *Int'l Research*, the Court of Appeals held that the industrial processing exemption applied to the cost of testing compounds for manufacturing clients because, in part, such tests "are 'an essential part of the process of manufacture.'"

[17] Senate Fiscal Agency Analysis, SB 323, June 2, 1987.

islative intent to avoid a pyramiding of sales and use tax.

### III

Because the Use Tax Act fails to define terms central to the inquiry, it is instructive to look to the Sales Tax Act.[18] The provisions in the Sales Tax Act are relevant to use tax determinations because the sales and use tax provisions are complementary and supplementary.[19] Both statutes contain a "recognition in each of the provisions and operation of the other." *Don McCullagh, Inc v Revenue Dep't*, 354 Mich 413, 425; 93 NW2d 252 (1958).[20]

The Sales Tax Act has an industrial processing exemption identical to the industrial processing exemption for the use tax.[21] The Sales Tax Act defines a "sale at retail" as:

---

[18] MCL 205.51 *et seq.*;  MSA 7.521 *et seq.*

[19] *Southeastern Michigan Transportation Authority v Secretary of State*, 104 Mich App 390, 399; 304 NW2d 846 (1981).  See also *Western Electric Co v Revenue Dep't*, 312 Mich 582, 596; 20 NW2d 734 (1945).  Generally, property, on which Michigan use tax has been paid, is exempted from the imposition of Michigan sales tax. Similarly, the use tax provisions except property acquired in a transaction in this state on which a sales tax has been paid in this state or a sales tax has been paid in another state for the same transaction or property. MCL 205.94;  MSA 7.555(4).

[20] In fact, apportionment of use tax has been authorized by impliedly applying the apportionment authorized by the Sales Tax Act, MCL 205.52; MSA 7.522,  to the imposition of a use tax. See *Kal-Aero v Treasury Dep't*, 123 Mich App 46; 333 NW2d 171 (1983).  See also *RCA Service Co Div v Treasury Dep't*, 135 Mich App 807; 355 NW2d 679 (1984).

[21] Section 4a(g)(i) of the Sales Tax Act provides:

An industrial processor for use or consumption in industrial processing. . . . Industrial processing does not include . . . the preparation of food and beverages by a retailer for retail sale. As used in this subdivision, "industrial processor" means a person who transforms, alters, or modifies tangible personal property by changing the form, composition, or character of the property for ultimate

[A] transaction by which the ownership of tangible personal property is transferred for consideration, if the transfer is made in the ordinary course of the transferor's business and is made to the transferee for consumption or use, *or for any purpose other than for resale* . . . .[22]

Because the company-owned restaurants purchase the Commissary's goods for the sole purpose of *resale* to customers, the Commissary's transfer to company-owned stores is not a *sale at retail* under this provision.

Under the Sales Tax Act, the right to an exemption is not decided by "what type of business the taxpayer is engaged in, but rather upon what use his patron or customer makes of the product which the taxpayer sells." *Int'l Research & Development Corp v Revenue Dep't*, 25 Mich App 8, 11; 181 NW2d 53 (1970). In this case, both company-owned and franchised restaurants purchase almost all wholesale items from the Commissary at the same price and for subsequent retail sale to patrons. Both company-owned and franchised restaurant patrons constitute "the last or final buyer, user, or consumer."[23] Consequently, Elias Brothers is not a retailer and does not make a sale at retail when its Commissary produces goods and transfers them to company-owned restaurants.

Nevertheless, the department claims Elias Brothers is a retailer when its Commissary transfers to company-owned restaurants because intracorporate sales are not taxable events. It further claims the only

---

sale at retail or sale to another industrial processor to be further processed for ultimate sale at retail. [MCL 205.54a(g)(i); MSA 7.525(g)(i).]

[22] MCL 205.51(b); MSA 7.521(b) (emphasis added).

[23] 1979 AC, R 205.6.

"sale," the character of which determines whether the Commissary's activity falls under the industrial processing exemption or the restaurant food preparation exclusion, occurs when Elias Brothers' company-owned restaurants make retail sales to their customers. We disagree. Nowhere in the statute is there a requirement that there must be a "sale" by the industrial processor to qualify for this exemption.[24] Nonetheless, Elias Brothers has established that transfers to company stores do not go unrecognized, but are accounted for and effectuated in the same manner as transfers or sales to franchised restaurants.[25] Given

---

[24] While the department provided this Court with ample definitions of the term "sale," recourse to such definitions "is unnecessary when the legislative intent . . . may be so readily gathered from a reading of the statute itself." *Renown Stove Co v Unemployment Compensation Comm*, 328 Mich 436, 440; 44 NW2d 1 (1950). This logic is particularly apt where the statute nowhere employs or imposes a transfer by means of a "sale" in the relevant portions of the industrial processing exemption.

The department offered no Michigan statute or applicable common law that would require a sale by the industrial processor under § 4(g) of the act. Instead, the department argued that because sales and use taxes are generally applicable to intercompany transfers, even if beneficial ownership of those companies is identical, the law should not recognize intracompany transfers for purposes of the industrial processing exemption. We do not find this inverse logic persuasive or necessary when § 4(g) does not require a sale by the industrial processor to the ultimate retailer. The exception only requires that the processing condition a raw material or product for "later sale" at retail. *Edison v Dep't of Revenue*, 362 Mich 158, 161; 106 NW2d 802 (1961). See also *Bay Bottled Gas Co v Dep't of Revenue*, 344 Mich 326; 74 NW2d 37 (1955).

Indeed, the General Sales Tax Act only requires that the taxpayer who engages in both taxable and nontaxable activity maintain accurate records to adequately distinguish between these distinct pursuits. MCL 205.52; MSA 7.522.

[25] The finance manager for Elias Brothers testified that the Commissary "sells," and not merely transfers, the processed food and beverages to both company-owned and franchised restaurants in the same manner and for the same price.

By way of reference, sales tax is measured by gross proceeds that include "the amount received in money, credits, subsidies, property, or other money's worth in consideration . . . ." MCL 205.51(h);     MSA

the statutory language and the facts of this case, the department's distinction between the Commissary's transfer to company-owned restaurants and franchisees is not relevant.

Contrary to the position of the department, the industrial processing exemption does not depend on the nature or existence of a transaction between the processor and the retailer. Rather, the application of the industrial processing exemption depends on the use to which equipment is put. The intent of the Legislature in enacting the restaurant food preparation exclusion supports this conclusion. In 1969 the department and the Senate Taxation Committee adopted a bill analysis that made the following comment regarding the purpose of the restaurant food preparation exclusion:

> The purpose of this amendment is to limit the exemption to persons who are actually engaged in the manufacturing of a product for resale.[26]

This bill analysis indicates that the cost of equipment and supplies purchased by manufacturers is exempt only if used for activities that are integral in industrial processing. The bill analysis in no way suggests that the restaurant food preparation exclusion should apply to a company simply because that company has a retailing division.

---

7.521(h). During oral argument, counsel for the department stated that the transfer to company-owned stores was reflected by an "internal accounting procedure," which could have been a credit/debit between corporate divisions; he did not believe there was an exchange of money.

[26] Executive Legislative Analyses, SB 1092 and 1093, November 7, 1969, p 5. This bill analysis was issued in support of SB 1092 and 1093, which added, among other items, the exception for "the preparation of food and beverages by a retailer for retail sale."

Thus, to determine whether the industrial process-
ing exemption applies, it is necessary to consider the
activity in which the equipment is engaged and not
the character of the equipment-owner's business. The
department admits that Elias Brothers is entitled to
the industrial processing exemption for the portion of
production dedicated to franchisees. Elias Brothers'
Commissary uses equipment in the same manner and
for the same purpose when it prepares goods that are
identical for its company-owned restaurants and
franchised restaurants. This Court finds that when
Elias Brothers processes and transfers to company-
owned restaurants, it uses the Commissary's equip-
ment in a manner covered by the industrial process-
ing exemption, rather than the restaurant food prepa-
ration exclusion.[27]

---

[27] This Court refuses to hold that "for all practical purposes" industrial
processing is "synonymous with the term 'manufacturing.'" *Post* at 162.
Our Legislature has deliberately chosen to use the term "industrial
processing" and has defined an industrial processor in the text of statute.
MCL 205.94(g); MSA 7.555(4)(g). We find no need to revert to treatises or
case law from other jurisdictions to further define the term where, in this
case, the department has conceded that Elias Brothers' Commissary is an
industrial processor and actually engages in industrial processing with
respect to production for franchisees.

We would also note that the case law relied on by the partial dissent is
distinguishable because of significant differences in statutory language,
facts or issues before the respective courts. See, generally, *HED, Inc v
Powers*, 84 NC App 292; 352 SE2d 265 (1987) (equipment used to prepare
food items sold *on premises* of individual restaurant was not exempt from
use tax); *McDonald's Corp v Oklahoma Tax Comm*, 563 P2d 635, 636
(Okla, 1977) (shake station, central island counter drink dispenser, and
soda factory, grills, toasters, french fry assembly, etc., were not equipment
used "in manufacturing or processing"). See also n 29.

In fact, the following cases, relied upon by the dissent, distinguish
between the act of manufacturing and processing: *McDonald's Corp,
supra* at 637-639; *Wilson & Co, Inc v Dep't of Revenue*, 531 SW2d 752, 754
(Mo, 1976).

Finally, because this Court finds that Elias Brothers' Commissary is an entirely separate and distinct operation, the exemption applies to the Commissary's equipment "actually engaged in the manufacturing of a product for eventual resale"[28] to company-owned restaurants. Michigan common law recognizes that taxpayers often engage in both taxable and nontaxable transactions. As long as taxpayers operate and substantiate the nontaxable activity in a distinct, identifiable, and clearly severable manner, Michigan courts uphold exemptions for the portion of exempt activity. See *RCA Service Co Div v Treasury Dep't*, 135 Mich App 807; 355 NW2d 679 (1984). See also *Kal-Aero v Treasury Dep't*, 123 Mich App 46; 333 NW2d 171 (1983). Elias Brothers engages in both industrial processing and retail sales with respect to its ownership and operation of company-owned restaurants. While Elias Brothers is a single corporate entity, the Commissary is physically, operationally, and financially distinct and separate from Elias Brothers' company-owned restaurants.[29] The distinct, iden-

---

[28] See n 26.

[29] The partial dissent cites the following case to support its assertion that taxpayers cannot avoid tax liability by creating a paper trail and moving taxable activity to a different site: *In re Marriott Family Restaurants v New York Tax Appeals Tribunal*, 174 AD2d 805; 570 NYS2d 741 (1991). The New York court's determination was based on New York State Tax Law 1115(a)(12), which exempts from use tax, in relevant part:

(m)achinery or equipment for use or consumption *directly and predominantly* in the production of *tangible personal property . . . for sale, by manufacturing . . . .* [Emphasis added.]

That court held that the requisite sale occurred only at retail stores at which time processed goods were "restaurant food," which, under New York common law, was not "tangible personal property." *Id.* at 806. Therefore, the court denied any exemption from use tax for the cost of equipment and supplies, but allowed a twenty-four percent deduction for the

tifiable, and clearly severable activity of the Commissary entitles Elias Brothers to an industrial processing exemption for equipment and supply costs associated with production for company-owned restaurants.

IV

Given the particular circumstances of this taxpayer and the legislative intent of the industrial processing exemption, we hold that Elias Brothers is entitled to the industrial processing exemption for the cost of equipment and supplies used by the Commissary in production for company-owned restaurants. Accordingly, we affirm the decision of the Court of Appeals.

BRICKLEY, C.J., and LEVIN and RILEY, JJ., concurred with WEAVER, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I concur with the result reached by the majority because the Department of Treasury has conceded that all the activity occurring at the Elias Brothers Commissary is industrial processing. If the food processing at issue is indeed industrial processing, then the legislative intent of encouraging manufactur-

---

cost of electricity, etc., used in producing goods sold to independent restaurants.

Michigan's industrial processing exemption is significantly different from New York's exemption, and, if applied to similar facts, would arguably dictate a different outcome. Michigan's industrial processing exemption does not require "direct and predominant use" of "equipment" in production. Michigan's industrial processing exemption applies to costs for equipment *and supplies* used, at some point, in the production process. Michigan's exemption requires an "ultimate sale," as distinguished from New York's requirement that there be a direct "sale, by manufacturing." Finally, Michigan' law does not currently impose a strict distinction between restaurant food processing and tangible personal property. See, generally, *In re Burger King, Inc v State Tax Comm*, 51 NY2d 614; 435 NYS2d 689; 416 NE2d 1024 (1980).

ing in Michigan is advanced by exempting the activity
from use taxes. However, if not all the departmental
operations are really engaged in manufacturing-type
processes, but instead are engaged in *service*-type
food preparation, then the industrial processing
exemption should not apply. I would hold that the
industrial processing exemption, which is to be
strictly construed against the taxpayer, should be
apportioned in accord with the nature of the activity
in the separate departments.

I write separately because I disagree with the
majority's consideration of the internal bookkeeping
system used to record the "transfer" of goods from
one intracorporate department to another within this
single taxpayer's business. In contrast, I believe that
the primary focus of our analysis should be on the
difference between food and beverage preparation
and industrial processing, with the secondary focus
on the difference between wholesale and retail.

I

Use taxes are levied on "the privilege of using, stor-
ing, or consuming tangible personal property in this
state . . . ." MCL 205.93; MSA 7.555(3). The use tax
statute exempts industrial processing. MCL 205.94(g);
MSA 7.555(4)(g).[1] In turn, the industrial processing

---

[1] The current use tax statute provides:

The tax levied does not apply to the following:

*       *       *

(g) Property sold to the following:
(i) *An industrial processor for use or consumption in indus-
trial processing.* Property used or consumed in industrial process-
ing does not include tangible personal property permanently
affixed and becoming a structural part of real estate; office furni-

exemption excepts "the preparation of food and beverages by a retailer for retail sale." *Id.* The latter language was added to the statute by 1970 PA 15. The accompanying legislative history reveals that the Legislature intended to limit the scope of industrial processing to *manufacturing*-type activity, and to exclude activity characterized as *services*.[2] 1987 PA 141 added the first definition of "industrial processor." The Legislature again intended to clarify the dis-

---

ture, office supplies, and administrative office equipment; or vehicles licensed and titled for use on public highways other than a specially designed vehicle, together with parts, used to mix and agitate materials added at a plant or jobsite in the concrete manufacturing process. *Industrial processing does not include* receipt and storage of raw materials purchased or extracted by the user or consumer, or *the preparation of food and beverages by a retailer for retail sale.* As used in this subdivision, "industrial processor" means a person who *transforms, alters, or modifies tangible personal property* by *changing the form, composition, or character of the property* for ultimate sale at retail or sale to another industrial processor to be further processed for ultimate sale at retail. *Sales to a person performing a service who does not act as an industrial processor while performing the service may not be excluded under this subdivision,* except as provided in subparagraph *(ii).* [Emphasis added.]

Subsection *(ii)* concerns computer usage. The sales tax statute also exempts industrial processing. MCL 205.54a(g); MSA 7.525(g).

   [2]  The purpose of this amendment is to limit the exemption to persons who are actually engaged in the *manufacturing* of a product for eventual resale.

   As the law now stands, many persons engaged in a service-type of activity are claiming the exemption. Some examples are:

                    *      *      *

   4. Retail vending companies . . . .

   The proposed change in the law will reduce, to some degree, the question of non-manufacturers trying to qualify for exemption. [Executive Legislative Analyses, SB 1092 and 1093, November 7, 1969, pp 5-6.]

tinction between true industrial processing and
service-type activity.[3]

As a preliminary matter, I note that although tax
statutes in other jurisdictions use varying terminol-
ogy, the legislative history reveals that the term
"industrial processing" is, for all practical purposes,
synonymous with the term "manufacturing." It has
been said that

> to constitute manufacturing, or to constitute one a manu-
> facturer, within the meaning of tax statutes, the operation,
> process, or activity in question must result in the produc-
> tion of a new and different article, product, or commodity,
> having, according to some cases, a distinctive name, charac-
> ter, or use. "Manufacturing," in this connection, has also
> been defined, in terms or substance, as the production of
> articles for use from raw or prepared materials by giving
> such materials new forms, qualities, properties, or combina-
> tions, whether by hand labor or by machinery; or as the
> production of something by hand or machinery, as distin-
> guished from a natural growth or process; or as the making
> or conversion of raw or partly finished materials into arti-
> cles suitable for use or marketing; or as a process which
> takes something practically unsuitable for any common use
> and changes it so as to adapt it to such common use.
> [Anno: *What constitutes manufacturing and who is a
> manufacturer under tax laws*, 17 ALR3d 7, § 3, pp 23-25.]

Similarly, the use tax statute provides that an
"industrial processor" is one who "transforms, alters,
or modifies tangible personal property." MCL
205.94(g); MSA 7.555(4)(g). As a rule, restaurant
food is not considered to be tangible personal prop-

---

[3] Senate Fiscal Agency Analysis, SB 323 (Second Analysis), July 14,
1987.

erty because it is a combination of food *and service*.[4] Additionally, industrial processing means "changing the form, composition, or character of the property." *Id.* What the Department of Treasury and the majority have failed to address is whether all the instant taxpayer's activities are really "changing the form, composition, or character" of the food products with which it starts into something different, as required by the statute.

### FOOD AND BEVERAGE PREPARATION

The use tax statute excepts from the industrial processing exemption retail food and beverage preparation. MCL 205.94(g); MSA 7.555(4)(g).[5] The underlying rationale is that many techniques for preparing and cooking various foods are not manufacturing-type processes, but rather service-type activities. See 17 ALR3d 7, § 29, pp 76-83.[6] Perhaps more significantly, the industrial processing exemption also now

---

[4]      Under a sales tax exemption for sales of machinery, equipment, parts, tools, and supplies used or consumed directly and predominantly in the production of tangible personal property for sale, the benefit of these exemptions is not available in the purchase of machinery, equipment, supplies and utilities used by a food processing plant which manufactures a variety of food products for use in restaurants. Food products manufactured at a taxpayer's processing plant and shipped elsewhere for sale in the taxpayer's restaurants are not tangible personal property within the meaning of the manufacturing exemptions. [68 Am Jur 2d, Sales and Use Tax, § 162, p 146.]

[5] By comparison, the sales tax statute excludes "food for human consumption, except prepared food intended for immediate consumption." MCL 205.54g(1)(a); MSA 7.525(7)(1)(a). "Prepared food intended for immediate consumption" is expressly defined as retail sales of what can be loosely summed up as restaurant or catered food. MCL 205.54g(4); MSA 7.525(7)(4). Consequently, the ultimate sale of restaurant food to the consumer generally will be subject to sales tax.

[6]      [T]he process of cooking or preparing food does not, by itself, constitute manufacturing for purposes of tax statutes. [*Id.* at 76.]

expressly excepts "[s]ales to a person performing a service who does not act as an industrial processor while performing the service . . . ." MCL 205.94(g)(i); MSA 7.555(4)(g)(i). I believe that in deciding whether the taxpayer will be entitled to the industrial processing exemption, in whole or in part, the focus should be on the statutory distinction between manufacturing-type processing and service activity.

Many courts have addressed various food production methods in relation to tax law. The *process* by which a taxpayer changes the starting product into the final product determines whether the taxpayer is engaged in a manufacturing-type activity or merely food preparation service activity. My research has revealed what can be described as a continuum, with highly technical operations at one end qualifying as manufacturing-type processes,[7] and simple washing and serving at the other end being labeled as simple food preparation activities.

An instructive case is *Phillips Harborplace, Inc v State Dep't of Assessments & Taxation*, 65 Md App 461; 501 A2d 92 (1985). There, the restaurant specialized in crab dishes. The court observed:

> For a product to be labeled as manufactured, it must go through "a substantial transformation in form and uses from its original state." This seems a singularly inappropriate way to describe seafood dishes prepared by a high quality restaurant which prides itself on using fresh and natural ingredients.

See *HED, Inc v Powers*, 84 NC App 292; 352 SE2d 265 (1987) (food prepared by Hardee's restaurants on the premises was not entitled to a manufacturing tax break).

[7] See, e.g., *Arkansas Beverage Co v Heath*, 257 Ark 991, 1002; 521 SW2d 835 (1975) (producing and bottling Pepsi products were held to be manufacturing processes).

\*     \*     \*

The Supreme Court in *Anheuser-Busch Brewing Association v United States*, 207 US 556 [562]; 28 S Ct 204; 52 L Ed 336 (1908)  provides insight to our problem, stating:

"Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary . . . . There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' "

To cook or boil or otherwise prepare a fish or a crustacean is to change the creature, certainly, but it is far from manufacturing it. The name of the final "product," be it crab imperial, lobster tail, or stuffed shrimp, implies a close linkage to its original state. The character of the product—its freshness, its natural taste—enforces this linkage. Stuffings and other additives may enhance the flavor of the food, but do not change its essential character. The reason fish, crabs, and the like are delivered to Phillips is that they will be used as food, and this use remains unchanged.

\*     \*     \*

We hold that it would be stretching the plain and popular meaning of the word past its breaking point if we were to say that appellant uses its kitchen equipment in the "manufacturing" of seafood. Kitchen equipment is not manufacturing equipment. [*Id.* at 465, 467-468 (citations omitted).]

Processes that correspond to mechanical baking,[8] which require sifting, mixing, and transforming separate dry and wet ingredients into a single baked good, have been characterized as manufacturing.[9] In contrast, processing slabs of meat into hamburger or

---

[8] *State v Lanasa*, 151 La 706; 92 So 306 (1922).

[9] *Fleet Pizza, Inc v Pennsylvania*, 119 Pa Commw 463, 469; 547 A2d 523 (1988) (a caterer preparing pizza, which the court found analogous to baking, was entitled to the manufacturing exemption).

steaks, turning chicken parts into chicken sand-
wiches, changing fish into fish sandwiches, and cook-
ing french fries have been · held not to be
manufacturing.[10]

In *Stewart Honeybee Products, Inc v Pennsylvania
Bd of Finance & Revenue*, 525 Pa 222, 226; 579 A2d
872 (1990), the court held that the term manufactur-
ing required that the starting substance be substan-
tially changed into "a new, different and useful item."
Consequently, the court determined that processing
honey was not manufacturing.[11] Likewise, preparing
salads and similar foods, including potato, macaroni,
bean, and egg salads, pudding, and clam chowder,
have been found not to be manufacturing because the
final product retains the same essential qualities as its
ingredients. *Van Bennett Food Co v City of Reading*,

---

[10] The court in *McDonald's Restaurants of Mass, Inc v Comm'r of Reve-
nue*, 393 Mass 1008, 1008-1009; 473 NE2d 1120 (1985), stated:

Despite McDonald's argument that its cooking process and
assembly of the constituent parts of its hamburger, chicken, and
fish sandwiches and other food·products is a species of manufac-
turing, the case is governed entirely by our decision in *York Steak
House Syss v Commissioner of Revenue*, 393 Mass 424; 472 NE2d
230 (1984), in which we held that the process by which commer-
cial grade cuts of beef become restaurant-quality steaks was not
manufacturing.

However, killing an animal and converting it into food products has been
held to be manufacturing. *Wilson & Co, Inc v Revenue Dep't*, 531 SW2d
752, 754-755 (Mo, 1976). See also *McDonald's Corp v Oklahoma Tax
Comm*, 563 P2d 635, 636, 641 (Okla, 1977) (shake maker, drink dispenser,
soda factory, grills, toasters, french fry assembly, and fish assembly were
not used in manufacturing).

[11]    Processed honey, like· other foods which are washed, heated
and filtered, may be more suitable for certain uses, but processed
foods generally, including honey, remain essentially what they were
before they were treated. [*Id.*]

87 Pa Commw 30, 37-38; 486 A2d 1025 (1985), explained:

> Thus, we must determine first whether the preparation methods used for the food products at issue consists of the application of a high degree of skill, science and labor; and second, whether there has been a substantial transformation in form, qualities and adaptability in use so as to produce a new, different and useful article.
>
> With respect to the food products at issue in the instant case, the record indicates that the preparation of cole slaw, pepper cabbage, health salad, tuna salad, and cranberry relish all involve a similar process consisting of cutting, chopping or dicing the primary ingredients, blending them together in a prepared dressing and packaging the final product. We do not find that the preparation of these products constitutes "manufacturing" as that term has been defined. We fail to see how the preparation of these products requires a high degree of skill, science or labor. It can certainly be done in the home on a smaller scale. *Moreover, although the method of preparation altered the size, shape and, in some instances, color of the original ingredients, these ingredients had not been changed to new and useful articles, substantially different in qualities and adaptability in use. The ingredients retained their same essential qualities and surely the final product is not to be put to a use not intended for the original ingredients.* [Emphasis added, citation omitted.][12]

---

[12] In *Muhlenberg Twp v Clover Farms Dairy Co*, ___ Pa Commw ___; 665 A2d 544 (1995), the taxpayer produced fruit juice, fruit drinks, and iced tea, which the court held was not manufacturing. The court recapped additional determinations by Pennsylvania courts:

[C]reating pickled and smoked meats, raw hide and skins, and bacon from carcasses was not manufacturing, because only a superficial change occurred since the original products were not substantially transformed into new products. Similarly, the pasteurization of milk is not manufacturing; but making cream, butter and skim milk is. [T]he production of tapioca and decaffeinated and instant coffee was held not to be manufacturing. . . . [C]utting up

ELIAS BROTHERS

In the instant case, the parties stipulated that "[t]he food processing activities include a bakery, meat department, sandwich department, ice cream plant, seafood processing department, and a department that produces soup, salad dressing, and pie fillings." Rather than viewing the Commissary as a single entity, as the majority and the Department of Treasury have done, I think it should have been broken down into departments, with each department analyzed in accord with the cases discussed above.

II

Additionally, I would reject the majority's rationale that a taxpayer can escape otherwise applicable use taxes simply because it performs the taxable activity at another site and creates a sufficient paper trail to document "transfer" of the food to the site of the sale to the consumer. This argument was rejected in *In re Marriott Family Restaurants v New York Tax Appeals Tribunal*, 174 AD2d 805; 570 NYS2d 741 (1991). There, the taxpayer manufactured a variety of food products for restaurants. It shipped seventy-six percent of its products to its own restaurants and twenty-four percent to other restaurants operated by licensees. The New York taxing authority allowed a manufacturing exemption from use tax for the

---

a calf carcass into raw pieces of veal does not constitute manufacturing.

There are cases which hold that the processing of certain food items is manufacturing: . . . converting potatoes into potato chips[,] . . . milling wheat into flour[,] . . . [and] processing buttermilk and skim milk into powdered milk. [*Id.*, 665 A2d 546, n 5 (citations omitted).]

twenty-four percent, but disallowed it for the seventy-six percent. The taxpayer argued that all the activity should be exempt because "the food [wa]s processed in a manufacturing facility that [wa]s entirely separate and distinct from the restaurant premises where the food [wa]s ultimately sold." *Id.* at 807. The court affirmed, explaining:

> Notwithstanding petitioner's argument to the contrary, we find nothing irrational in respondent's interpretation insofar as it results in similar treatment for machinery and equipment regardless of whether it is used in processing food on the restaurant premises or at a separate facility. *Whether the food is processed at a separate facility belonging to petitioner and shipped to petitioner's restaurants for final preparation or the food processing and preparation occurs entirely within the restaurant, the taxable event is the sale in the restaurant of a combination of food and service, which respondent could rationally view as a "hybrid" transaction rather than the sale of tangible personal property* . . . . [*Id.* at 807-808 (emphasis added).]

In contrast, the majority here would arguably allow a restaurant to move its kitchen across the street, or even next door, to a "physically" distinct location, and, as long as it creates a sufficient paper trail of "sales" to itself, it will escape otherwise applicable use taxes because its kitchen is a "distinct, identifiable, and clearly severable activity." *Ante* at 158-159. This is not what the Legislature intended by industrial processing.

The industrial processing exemption expressly provides: "[s]*ales to a person performing a service who does not act as an industrial processor while performing the service may not be excluded under this subdivision* . . . ." MCL 205.94(g);  MSA 7.555(4)(g) (emphasis added). The restaurant *service* of providing

food preparation does not become industrial process-
ing just because it is done in a different location or
with a bigger kitchen utensil. It becomes industrial
processing when it "chang[es] the form, composition,
or character" of the starting product into a new prod-
uct. *Id.*

III

In conclusion, I concur with the result reached by
the majority, but dissent from its analysis for the rea-
sons stated.

MALLETT, J., concurred with CAVANAGH, J.

BOYLE, J., took no part in the decision of this case.