AUTOALLIANCE INTERNATIONAL, INC v
DEPARTMENT OF TREASURY

Docket No. 282096. Submitted February 3, 2009, at Lansing. Decided
February 24, 2009, at 9:05 a.m.

AutoAlliance International, Inc., a joint venture between the Ford
Motor Company and Mazda Motor Corporation, brought an action
against the Department of Treasury in the Court of Claims,
William E. Collette, J., after the department denied the plaintiff's
claims for a refund of taxes paid on motor fuel that the plaintiff
claimed was exempt from the motor fuel tax because the plaintiff
was an end user that used the fuel for nonhighway purposes. The
Court of Claims granted summary disposition in favor of the
department, ruling that the plaintiff failed to present evidence
concerning the actual amount of fuel that it used for a nontaxable
purpose. The plaintiff appealed, claiming a tax exemption for the
entire 3.2 gallons of fuel that it placed in each vehicle to power the
vehicle for final testing and quality control and to ensure that the
vehicle did not run out of fuel during those procedures. The
plaintiff's claim relates solely to the fuel placed in vehicles that
were destined for out-of-state delivery.

The Court of Appeals *held*:

1. As interpreted in *DaimlerChrysler Corp v Dep't of Treasury*,
268 Mich App 528 (2005), whether a person qualifies as an "end
user" under MCL 207.1033 and MCL 207.1039 does not depend on
whether the person puts the fuel to his or her own use or sells it to
a third party. Rather, the person must use the fuel in a manner
that is consistent with the way in which one would typically use
the fuel in the machine at issue. Thus, where the motor fuel is put
into a motor vehicle, in order for the person to qualify as an end
user, the person must use the fuel to power the motor vehicle.

2. The plaintiff qualified as an "end user" of the fuel it placed
in the vehicles because it used the fuel to power the vehicles during
the testing process.

3. The verb "use," in the context of a commodity such as motor
fuel, means to employ for some purpose, to apply to one's own
purposes, or to consume, expend, or exhaust. The plaintiff clearly
"used" the full 3.2 gallons for purposes of MCL 207.1033 and MCL

207.1039 because it actually consumed part of it and used the rest for its own purposes to ensure that the vehicles could complete the testing procedures without running out of fuel.

4. The undisputed evidence indicates that the plaintiff used the fuel for a nonhighway purpose because it used the fuel for purposes other than to operate the vehicles on Michigan's public roads or highways. There is no possibility that the incidental amounts of fuel remaining in the vehicles that are shipped out of state will be used to power the vehicles on Michigan's public roads or highways. The plaintiff met its burden and established that is was entitled to a refund of the tax on the entire 3.2 gallons without regard to the actual amount consumed during the testing and quality control procedures.

Reversed and remanded for entry of an order of summary disposition in favor of the plaintiff.

TAXATION — MOTOR FUEL TAX — REFUNDS OF TAX — WORDS AND PHRASES — END USER OF MOTOR FUEL — USE OF MOTOR FUEL — NONHIGHWAY PURPOSES.

A taxpayer seeking a refund of the tax paid on motor fuel must establish that the taxpayer is an end user of the fuel and used the fuel for nonhighway purposes; the taxpayer must use the fuel to power the motor vehicle at issue to qualify as an end user; the taxpayer must employ the fuel for some purpose, apply it to its own purposes, or consume, expend, or exhaust it in order to use the fuel; use for nonhighway purposes means use for purposes other than to operate a vehicle on public roads or highways (MCL 207.1033, 207.1039).

*Varnum, Riddering, Schmidt & Howlett LLP* (by *Thomas J. Kenny, Marla S. Carew*, and *Paul V. McCord*) for the plaintiff.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Heidi L. Johnson-Mehney*, Assistant Attorney General, for the defendant.

Before: SAWYER, P.J., and SERVITTO and M. J. KELLY, JJ.

M. J. KELLY, J. In this suit for a refund of taxes paid on motor fuel, plaintiff, AutoAlliance International, Inc., appeals as of right the Court of Claims grant of summary disposition in favor of defendant, Depart-

ment of Treasury (the Department). On appeal, we conclude that the Court of Claims erred when it required AutoAlliance to present evidence of the amount of fuel actually consumed during the operation of the vehicles at issue before it could claim a refund. Because AutoAlliance presented undisputed evidence that it was an end user and that it used the motor fuel at issue for nonhighway purposes, it was entitled to a refund of the taxes paid on the motor fuel. For this reason, we reverse and remand for entry of judgment in favor of AutoAlliance.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The facts in this case are not in dispute.[1] AutoAlliance is a joint venture between Ford Motor Company and Mazda Motor Corporation. During the 2002-2003 tax period, AutoAlliance assembled Ford and Mazda automobiles at its plant in Flat Rock, Michigan. During this period, AutoAlliance purchased gasoline and diesel fuel in bulk quantities and paid the Michigan motor fuel tax on the fuel purchases. After AutoAlliance purchased the fuel, the vendor would deliver it to the Flat Rock facility and place it in underground storage tanks. AutoAlliance then placed a predetermined amount of motor fuel in the fuel tank of each newly assembled vehicle during the period in issue.

AutoAlliance previously requested and obtained from the Department a refund on the amount of taxes paid on the fuel placed in the tank of each newly assembled vehicle destined for out-of-state automobile dealers. The Department approved AutoAlliance's claims for refunds until April 2001.

---

[1] On May 10, 2007, the parties submitted a stipulation of facts to the Court of Claims.

AutoAlliance filed claims with the Department seeking a refund of the motor fuel taxes paid on some of its fuel purchases during the 2002 to 2003 tax period. As the basis for its claims, AutoAlliance selected "Non-Taxable Use of Gasoline—Industrial/Commercial." AutoAlliance claimed that it was owed refunds totaling more than $90,000 for this period. In May 2005, the Department denied each claim on the ground that AutoAlliance was not an exporter. AutoAlliance only claimed refunds related to motor fuel placed in vehicles destined for out-of-state dealers; it did not seek a refund on motor fuel placed in new vehicles sold to Michigan dealers.

After its requests for refunds were denied, AutoAlliance asked for a final decision from the Department. The Department issued its final decision denying the requested refunds in October 2005. In December 2005, AutoAlliance sued the Department for a refund in the Court of Claims.

In July 2007, the Court of Claims held an evidentiary hearing on the matter. At the hearing, Jeffrey Donnelly testified that he was employed by Ford and worked at AutoAlliance's plant in Flat Rock. Donnelly stated that he was the manufacturing engineering manager. Donnelly testified that he was familiar with AutoAlliance's use of fuel in newly assembled vehicles because it was his responsibility to ensure that the vehicles each had the correct amount of fuel.

In outlining AutoAlliance's fuel use, Donnelly explained that AutoAlliance would contact a supplier for delivery of fuel. When delivered, the supplier would pump the fuel into one of two underground storage tanks at the plant. Each storage tank held 20,000 gallons. The underground tanks were connected to a fuel pump that was located at the last station on the

assembly line. The fuel would then be placed into the assembled vehicles at this station. AutoAlliance placed 3.2 gallons of fuel in the vehicles it manufactured during the relevant period in order to power the vehicles during the final testing and quality control procedures that occurred after assembly. The 3.2 gallon amount was selected to ensure that the vehicles did not run out of fuel during the testing.

After the fuel was put in the vehicle, a worker would drive it to various testing and quality control stations. Donnelly stated that the vehicle would be turned off at some stations and would run throughout the testing at other stations. A typical process lasted 70 minutes from fuel fill to the last station.

After performing these tests, a worker would drive the vehicle approximately $1/2$ mile to the rough road area to check it for wind noise and drivability issues. The vehicle was then taken to the code check, which is where an electronic device is plugged into the vehicle to look for internal vehicle imperfections resulting from the assembly process. Finally, the vehicle was driven to a storage area.

Donnelly also testified that approximately 15 to 20 percent of the vehicles were driven $6^{1}/4$ miles to the Mazda North America Operations site for installation of aftermarket items such as burglar systems, remote starters, and any other feature the customer may have ordered. These vehicles went through another inspection to make sure that there were no additional faults generated in the installation of the aftermarket features. The final step in the process was to take the vehicle to the shipping lane and load it for shipping.

Donnelly testified that he did not know the exact amount of fuel that each vehicle used during the testing process. Donnelly also stated that the new vehicles

assembled at Flat Rock were not driven on Michigan's public roads or highways before shipment.

Dan Pampuch also testified at the evidentiary hearing. Pampuch stated that he was AutoAlliance's controller for the last two years and that he worked for AutoAlliance for a little over 20 years. Before becoming the controller, Pampuch was AutoAlliance's treasurer and assistant treasurer. Pampuch testified that he was responsible for filing the motor fuel tax returns, and that he was familiar with the procedure for purchasing fuel from 1989 to 2001. Pampuch said that, from 1989 to 2001, the Department had refunded the taxes paid on fuel placed in new vehicles that were shipped out of state. He explained:

> What we would do is we would determine how much gasoline was placed in each vehicle and then we would determine what destination the vehicle was intended to go to. And we would file a refund for those gallons that were to be placed in vehicles destined for outside of Michigan.

Pampuch said that the refund request submitted to the Department provided that the motor fuel tax refund was for fuel placed in vehicles that would be shipped out of state and not used or consumed on Michigan highways.

Pampuch admitted that he did not know how much fuel was actually used during the testing and quality control procedures or how much remained in the tank after each station.

In August 2007, the Department moved for summary disposition under MCR 2.116(C)(10). In its brief in support of its motion for summary disposition, the Department noted that AutoAlliance had not presented any evidence concerning the exact amount of fuel used during the testing process for the vehicles at issue. The Department argued that, absent evidence of the exact

amount of fuel used for a nontaxable purpose, AutoAlliance was not entitled to a refund. In contrast, AutoAlliance argued that, because the 3.2 gallons of fuel selected for placement in each vehicle was calculated to be the minimum amount needed to ensure that the vehicles could proceed through testing without running out of fuel, it "used" that amount. For that reason, AutoAlliance argued that it was entitled to a refund of the taxes paid on the full 3.2 gallons put into each vehicle shipped out of state.

In November 2007, the Court of Claims issued its opinion and order granting summary disposition in favor of the Department with regard to AutoAlliance's request for a tax refund. The court determined that AutoAlliance failed to present evidence concerning the actual amount of fuel used for a nontaxable purpose:

> [I]n this case, the primary issue is one of fact; not of terminology. Although [AutoAlliance] was certainly an "end user" as defined by the Act, [AutoAlliance] was an "end user" of an *unknown* amount of motor fuel. [AutoAlliance] used that same unknown amount of motor fuel for the claimed exempt purpose (i.e., for a non-highway purpose). The Act does not contain any provision permitting the use of estimates in requesting a refund of motor fuel tax paid. . . . Since [AutoAlliance] has admitted that it has no idea how much of the fuel was actually consumed for the exempt purpose—or how much of it remained in the gas tanks following the exempt use—[AutoAlliance's] refund claim should be denied. [Emphasis in original.]

This appeal followed.

## II. TAX REFUND FOR MOTOR FUEL

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision to grant summary disposition. *Hamade v Sunoco, Inc*

*(R&M)*, 271 Mich App 145, 153; 721 NW2d 233 (2006). This Court also reviews de novo the proper interpretation of statutes, such as the Motor Fuel Tax Act. *State Farm Fire & Cas Co v Corby Energy Services, Inc*, 271 Mich App 480, 483; 722 NW2d 906 (2006).

### B. THE MOTOR FUEL TAX ACT

The Motor Fuel Tax Act, see MCL 207.1001 *et seq.*, imposes a tax on motor fuel that is "imported into or sold, delivered, or used" in Michigan. See MCL 207.1008(1). For gasoline, the tax is equal to 19 cents a gallon. MCL 207.1008(1)(a). The purpose of the tax act is to "require persons who operate a motor vehicle on the public roads or highways of this state to pay for the privilege of using those roads or highways." MCL 207.1008(5)(a). However, the tax act also provides that "persons who pay the tax imposed by this act and who use the fuel for a nontaxable purpose" may "seek a refund or claim a deduction as provided in this act." MCL 207.1008(5)(c). MCL 207.1032 permits a taxpayer to seek a refund of the taxes paid on motor fuel used for the nontaxable purposes described under MCL 207.1033 to MCL 207.1047. In order to obtain a refund, the taxpayer must comply with the requirements of MCL 207.1048.

### C. END USER

AutoAlliance argues that it is entitled to a refund of the motor fuel taxes paid on the 3.2 gallons of fuel placed in each vehicle that it tested at its facility and that it later shipped out of this state. AutoAlliance relies on MCL 207.1033 and MCL 207.1039. MCL 207.1033 provides that an "end user may seek a refund for tax paid under this act on motor fuel used by the person for nonhighway purposes." Similarly, under

MCL 207.1039, an "end user may seek a refund for tax paid under this act on motor fuel or leaded racing fuel used in an implement of husbandry or otherwise used for a nonhighway purpose not otherwise expressly exempted under this act." Thus, in order to be entitled to a refund under either MCL 207.1033 or MCL 207.1039, the person seeking the refund must be an "end user" and must have used the motor fuel "for nonhighway purposes." Although the parties do not appear to dispute that AutoAlliance was an "end user" in some regard, because the parties' arguments do not clearly distinguish between AutoAlliance's status as an "end user," the nature of the "use" at issue, and whether the "use" was for a "nonhighway purpose," for the sake of clarity, we shall first address whether and to what extent AutoAlliance was an "end user" within the meaning of MCL 207.1033 and MCL 207.1039.

Because "end user" is not defined in the Motor Fuel Tax Act, we would normally give this term its ordinary meaning. See *Wolfe-Haddad Estate v Oakland Co*, 272 Mich App 323, 325; 725 NW2d 80 (2006). The ordinary meaning of "end user" is someone who purchases a product and puts it to use for his or her own purposes—as opposed to selling the product to a third party. In the context of the Motor Fuel Tax Act generally, and MCL 207.1033 and MCL 207.1039 specifically, the term "end user" plainly applies to an end user of motor fuel. Hence, an end user of motor fuel would be any person who purchases motor fuel for his or her own use—that is, an end user is someone other than a jobber or retailer who purchases the motor fuel in order to resell it to a third party. See *Random House Webster's College Dictionary* (1997) (defining "jobber" as "a wholesale merchant" or "one selling to retailers" and defining "retail" as "the sale of goods to ultimate consumers"); MCL 207.1005(1)(e) and (f) (defining re-

tail diesel dealers and retail marine diesel dealers as persons who sell or distribute fuel to an "end user"). Thus, were we able to construe this term according to its plain and ordinary meaning, we would conclude that AutoAlliance clearly constitutes an end user: AutoAlliance does not purchase and place fuel in the newly manufactured vehicles in order to sell the fuel to third parties. Rather, AutoAlliance places the fuel into newly manufactured vehicles in order to facilitate its final testing and quality control measures. The fact that an incidental amount of fuel remains in the vehicles after the conclusion of testing and quality control does not alter AutoAlliance's status as an end user. Nevertheless, because a prior panel of this Court has already construed the term "end user," we are no longer at liberty to give this term its plain and ordinary meaning. See MCR 7.215(J)(1).

In *DaimlerChrysler Corp v Dep't of Treasury*, 268 Mich App 528, 530-533; 708 NW2d 461 (2005), this Court had to determine whether DaimlerChrysler was entitled to a tax refund for the amount of unused fuel placed into newly manufactured vehicles that were to be shipped out of state. In order to resolve the issue on appeal, the Court had to construe the term "end user" as used in MCL 207.1033. The Court first turned to the dictionary and noted that "end user" is defined as " 'the ultimate user for whom a machine, [such] as a computer, or product, [such] as a computer program, is designed.' " *DaimlerChrysler*, 268 Mich App at 536, quoting *The Random House Dictionary of the English Language: Second Edition Unabridged*.[2] The Court also

---

[2] We note that this definition is consistent with our conclusion that an "end user" is a person who puts the motor fuel to his or her own use as opposed to purchasing the motor fuel in order to sell it to a retailer or to the general public.

noted that MCL 207.1026 equated "used" or "consumed" with " 'producing or generating power for propelling the motor vehicle.' " *DaimlerChrysler*, 268 Mich App at 536, quoting MCL 207.1026. From this, the Court concluded that "an end user of motor fuel is the ultimate user of the motor fuel, i.e., the party who uses the fuel to power the motor vehicle into which the fuel was placed." *Daimler-Chrysler*, 268 Mich App at 536. After construing "end user" in this manner, the Court concluded that Daimler-Chrysler was not an end user because it "never used the fuel at issue to power the vehicles. Rather, [Daimler-Chrysler] passed the fuel on to the dealership, which may have used the fuel to power the vehicle or may have passed the fuel on to a purchaser who used the fuel to power the vehicle."[3] *Id.* at 536-537.

As interpreted by the Court in *DaimlerChrysler*, whether a person qualifies as an end user does not depend on whether that person puts the fuel to his or her own use or sells it to a third party. Rather, to qualify as an end user under *DaimlerChrysler*, a person must apparently use the fuel in a manner that is consistent with the way in which one would typically use the fuel in the machine at issue. Thus, where the motor fuel is put into a motor vehicle, in order for the person to qualify as an end user, that person must use "the fuel to power the motor vehicle . . . ." *Id.* at 536. We do not agree that whether one qualifies as an end user should depend on whether one uses the fuel in a manner that is consistent with the typical use of a particular machine.[4] Rather, whether a person qualifies as an end

---

[3] Because DaimlerChrysler's claim was limited to unused fuel, the Court declined to consider whether DaimlerChrysler could qualify as an end user to the extent that it had used motor fuel to power vehicles within its facilities. *Id.* at 536 n 4.

[4] The interpretation in *DaimlerChrysler* appears to blur the distinction between an end user of motor fuel and an end user of a particular

user should depend on whether the person acts as a typical middleman (such as a jobber or retailer) and sells the fuel to third parties or acts as a typical consumer and puts the fuel to his or her own use. Nevertheless, because the decision in *DaimlerChrysler* is directly applicable to the facts of this case, we must apply it.

In the present case, it is undisputed that AutoAlliance placed 3.2 gallons of motor fuel into each vehicle that it manufactured during the period at issue at the last station along the assembly line. The plant's workers placed the fuel in the new vehicles in order to enable the workers to move the vehicles through the final testing and quality control procedures, to drive some vehicles to a facility for installation of aftermarket parts, and to drive the vehicles to the point at which the vehicles were loaded for final shipment. Testimony also established that, although not every vehicle might need the full 3.2 gallons in order to move throughout the final testing and quality control procedures, that amount was selected to ensure that production would not be disrupted by vehicles running out of fuel. Because it used the motor fuel to power the vehicles during the testing process, we conclude that AutoAlliance qualified as an end user of the motor fuel it placed in the vehicles at issue under the decision in *Daimler-Chrysler*.

---

machine—such as an automobile. Although an end user of an automobile may typically use motor fuel to power or propel the automobile, one can easily imagine situations where a manufacturer may need to place fuel into the automobile's fuel system even though the manufacturer never uses the fuel to power it. Examples include checking the fuel system for leaks and ensuring that the automobile will start and can be driven a sufficient distance for the initial purchaser to fill the fuel tank. Thus, a manufacturer's use of fuel might very well differ from that of the typical end user of the *automobile*, but that does not necessitate the conclusion that the manufacturer is not an end user of the *motor fuel*.

D. USE FOR NONHIGHWAY PURPOSES

However, having concluded that AutoAlliance is an end user does not resolve the present appeal. An end user is only entitled to a refund of the taxes paid on motor fuel to the extent that it "used" the motor fuel for "nonhighway purposes." See MCL 207.1033; MCL 207.1039. Hence, AutoAlliance would only be entitled to a refund of the taxes paid on motor fuel that it "used" and then only to the extent that it "used" that fuel for "nonhighway purposes."

On appeal, the Department apparently concedes that AutoAlliance was an end user of a portion of the 3.2 gallons placed in the vehicles at issue and that it used that portion for a nonhighway purpose. Nevertheless, the Department contends that AutoAlliance failed to present evidence concerning the specific amount of motor fuel used to power the vehicles at issue and, for that reason, argues that AutoAlliance is not entitled to a refund of the taxes paid on any portion of the 3.2 gallons. In making this argument, the Department implicitly assumes that, in order to use motor fuel for a nonhighway purpose, the taxpayer must actually use the fuel to power the vehicle.[5] That is, the Department

_____

[5] This understanding conflates the test stated in *DaimlerChrysler* for determining whether a particular person is an "end user" with the type of use that must be for a nonhighway purpose in order to obtain a refund. However, the nature of the actual use and whether it constitutes use for "nonhighway purposes" is a separate inquiry from whether the taxpayer is an "end user." Once AutoAlliance established that it used the fuel at issue—at least in part—to power vehicles, it met the test stated in *DaimlerChrysler* and qualified as an "end user." After AutoAlliance qualified as an "end user" of the fuel at issue, it became necessary to examine the nature of the specific uses to which the fuel was put and whether those uses were for "nonhighway purposes." At that point, the evidence that AutoAlliance might not have used the entire amount of fuel to power the vehicles was relevant but not dispositive.

equates "use" of fuel with "consumption" of fuel. However, we do not agree that the term "used" has such a limited meaning.

Because the Motor Fuel Tax Act does not define "used," we must give it its ordinary meaning. *Wolfe-Haddad Estate*, 272 Mich App at 325. The ordinary meaning of the verb "use," in the context of a commodity such as motor fuel, is "to employ for some purpose," to "apply to one's own purposes," or to "consume, expend, or exhaust." *Random House Webster's College Dictionary* (1997). Understood in this light, AutoAlliance clearly "used" the full 3.2 gallons placed into the vehicles at issue. The evidence established that AutoAlliance actually consumed a portion of the 3.2 gallons of motor fuel placed into each vehicle during the quality control and testing procedures that it performed after the vehicles left the assembly line. Further, the evidence demonstrated that AutoAlliance selected the 3.2-gallon amount in order to ensure that the vehicles would be able to complete these procedures without running out of fuel.[6] Hence, to the extent that fuel remained in the vehicles after all the tests were performed, that fuel was nevertheless "employed" for AutoAlliance's "own purposes." As such, even though AutoAlliance might not have consumed the entire 3.2 gallons during these procedures, it still "used" the full 3.2 gallons within the meaning of MCL 207.1033 and MCL 207.1039.

---

[6] There was no evidence that AutoAlliance selected the amount of fuel to place in the vehicles for any reason other than to ensure that the vehicles had the minimum amount of fuel necessary to complete the testing and quality control procedures while minimizing the risk of disruptions caused by vehicles running out of fuel. Hence, this is not a case where the manufacturer might be deliberately attempting to transfer fuel to a third party for the third party's use. In such a case, the Department might be justified in treating the manufacturer as a middleman (such as a jobber or retailer) rather than an end user.

Moreover, the undisputed evidence indicates that AutoAlliance used the motor fuel for a nonhighway purpose. The phrases "for nonhighway purposes" and "for a nonhighway purpose" must be understood in light of the purpose behind the tax act. See MCL 207.1033 and MCL 207.1039. The tax act requires "persons who operate a motor vehicle on the public roads or highways of this state to pay for the privilege of using those roads or highways." MCL 207.1008(5)(a). Further, the tax act defines "[p]ublic roads or highways" to be "a road, street, or place maintained by this state or a political subdivision of this state and generally open to use by the public as a matter of right for the purpose of vehicular travel . . . ." MCL 207.1004(k). Because the intent behind the tax act is to impose a tax on gasoline so that a motor vehicle operator pays for the privilege of using public roads or highways, the phrase "for nonhighway purposes" must mean for purposes other than to operate a vehicle on public roads or highways. Because we have already determined that AutoAlliance was an "end user" and "used" the full 3.2 gallons of motor fuel placed in each of the vehicles at issue, AutoAlliance would be entitled to a refund of the motor fuel taxes paid on the full 3.2 gallons if it "used" the whole amount for purposes other than to operate the vehicles at issue on Michigan's public roads or highways.

It is undisputed that AutoAlliance never drove any of the vehicles at issue on Michigan's public roads or highways; rather, AutoAlliance operated the vehicles in and around its own facilities before loading them on transports for shipment to dealers. Thus, the fuel actually consumed during the testing and quality control procedures was clearly not used to operate the vehicles on public roads or highways. Nevertheless, because the fuel remaining in the vehicles after testing

and quality control could ultimately be used as an additional use to operate the vehicles on Michigan's roads or highways, in order to qualify for a refund on the remaining amounts of fuel, AutoAlliance had to present evidence that the fuel would not ultimately be used to operate the vehicles on Michigan's roads or highways.

The parties do not dispute that AutoAlliance shipped some of the new vehicles to dealers in Michigan and others to dealers outside Michigan. However, AutoAlliance has not claimed a refund with regard to any vehicles that were shipped to destinations in Michigan. Instead, AutoAlliance only claimed a refund with regard to those vehicles that it shipped out of this state. Because those vehicles were shipped out of state, there is no possibility that the incidental amounts of motor fuel remaining in the vehicles were used to power the vehicles on Michigan's public roads or highways. Therefore, AutoAlliance met its burden and established that it was entitled to a refund on the tax on the entire 3.2 gallons of fuel placed into each of the vehicles at issue without regard to the actual amount of fuel consumed during the testing and quality control procedures.[7]

### E. CONCLUSION

In order to establish the right to a refund of the taxes paid on motor fuel under MCL 207.1033 or MCL

---

[7] Because AutoAlliance used the full 3.2 gallons of fuel at issue for a nonhighway purpose, the Department's reliance on authorities involving mixed-use situations—that is, situations where the taxpayer cannot accurately identify the amount of fuel used for a nonhighway purposes—is misplaced. See, e.g., *Charles E Austin, Inc v Secretary of State*, 321 Mich 426; 32 NW2d 694 (1948). Likewise, for the same reason, we do not need to determine the quantum of proof necessary to establish an entitlement to a refund where the uses on public roads or highways are commingled with uses for nonhighway purposes.

207.1039, the taxpayer must establish that he or she is an "end user" of motor fuel and that he or she "used" the motor fuel at issue for "nonhighway purposes." In this case, the undisputed facts show that AutoAlliance used the motor fuel at issue to power vehicles. Hence, it was an end user of the motor fuel. Further, with regard to the motor fuel at issue, the undisputed facts show that AutoAlliance employed the full 3.2 gallons placed in each vehicle for its own purposes. Thus, it used the full 3.2 gallons within the meaning of MCL 207.1033 and MCL 207.1039. Finally, because the evidence demonstrates that no amount of the 3.2 gallons placed in the vehicles shipped out of state was used or could be used to operate the vehicles on Michigan's public roads or highways, AutoAlliance established that its use was "for nonhighway purposes." Consequently, the Court of Claims erred when it concluded that AutoAlliance could not claim a refund for the full amount of the 3.2 gallons of fuel placed in each of the vehicles it shipped out of state. For this reason, we reverse the Court of Claims grant of summary disposition in favor of the Department and remand the case for entry of summary disposition in favor of AutoAlliance.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Because this appeal involved important issues of public policy, AutoAlliance may not tax its appellate costs as a prevailing party. MCR 7.219(A).