GRANGER LAND DEVELOPMENT COMPANY v
DEPARTMENT OF TREASURY

Docket No. 286355. Submitted December 2, 2009, at Lansing. Decided
    December 29, 2009, at 9:15 a.m.

Granger Land Development Company and Granger Waste Manage-
    ment Company brought an action in the Court of Claims against
    the Department of Treasury, seeking the refund of use taxes paid
    under protest. The taxes had been imposed on materials used to
    make landfill cells and the equipment used or consumed by
    plaintiffs in the operation of the landfill cells. Plaintiffs alleged
    that the materials and equipment were used or consumed as part
    of the industrial process of processing solid waste material in the
    cells to generate methane gas as it decomposes and, therefore,
    plaintiffs were entitled to the exemption from sales and use
    taxation applicable to materials and equipment used in industrial
    processing. Defendant alleged that the materials and equipment
    were not used in an industrial process or, in the alternative, that
    the materials were incorporated into real property and the equip-
    ment was used to groom real property and, therefore, the exemp-
    tion did not apply. The Court of Claims, Paula J. M. Manderfield,
    J., determined that plaintiffs were entitled to the exemption and
    ordered defendant to refund the taxes paid under protest. Defen-
    dant appealed.

    The Court of Appeals held:

    1. The industrial processing exemption, MCL 205.94o(4)(d)
    and (5)(a), does not apply to tangible personal property that both
    is permanently affixed to and becomes a structural part of real
    estate, even if the personal property is otherwise used in industrial
    processing.

    2. No bright-line test applies for determining whether and
    when an item of personal property has become sufficiently con-
    nected with real property that it should be treated as part of the
    real estate. Michigan courts traditionally examine all the relevant
    factors and determine case-by-case whether personal property has
    become sufficiently affixed to real property that it should be
    treated as part of the real estate. Factors to examine include
    whether the property was actually or constructively annexed to

the real estate, whether the property was adapted or applied to the use or purpose of that part of the realty to which the property in question is connected or appropriated, and whether the property owner intended to make the property a permanent accession to the realty.

3. Plaintiffs, under the unique facts of this case, did not actually or constructively annex the landfill cells at issue to their real property. The erection and maintenance of the cells does not amount to an adaption of the land. Finally, although the cells could remain in place indefinitely, it does not necessarily follow that plaintiffs intended the erection of the cells to be an accession to the real estate. Plaintiffs intend to use and actually use the raw material and personal property as part of its industrial process. If the waste material left after plaintiffs finish their processing does become constructively annexed to the real property at some future point, that fact does not render the personal property consumed in the processing subject to the use tax.

4. The heavy equipment that plaintiffs use to physically transport and process the waste and to erect the cells is clearly being used as part of the industrial processing of the waste and not to design, engineer, construct, or maintain real property and is therefore exempt from use tax.

Affirmed.

1. TAXATION — USE TAX ACT — INDUSTRIAL PROCESSING EXEMPTION.

The industrial processing exemption from taxation under the Use Tax Act for personal property used or consumed during industrial processing does not apply to tangible personal property that both is permanently affixed to and becomes a structural part of real estate, even if the personal property is otherwise used in industrial processing (MCL 205.94o[4][d] and [5][a]).

2. TAXATION — REAL PROPERTY — PERSONAL PROPERTY.

The determination whether personal property has become sufficiently affixed to real property so that it should be treated as part of the real estate for purposes of taxation is made case-by-case after examining all the relevant factors including whether the property was actually or constructively annexed to the real estate, whether the property was adapted or applied to the use or purpose of that part of the realty to which the property in question is connected or appropriated, and whether the property owner intended to make the property a permanent accession to the realty.

3. TAXATION — USE TAX ACT — PERSONAL PROPERTY — INDUSTRIAL PROCESSING
     EXEMPTION.

> Personal property used or consumed in the design, engineering,
> construction, or maintenance of real property does not fall within
> the exemption from taxation under the Use Tax Act applicable to
> personal property used or consumed during industrial processing
> (MCL 205.94o[6][d]).

*Willingham & Coté, P.C.* (by *James L. Dalton* and *Kimberlee A. Hillock*), for plaintiffs.

*Michael A. Cox,* Attorney General, *B. Eric Restuccia,* Solicitor General, and *Kevin T. Smith,* Assistant Attorney General, for defendant.

Before: BECKERING, P.J., and CAVANAGH and M. J. KELLY, JJ.

M. J. KELLY, J. In this suit for a tax refund, defendant Department of Treasury (the Department) appeals as of right the Court of Claims order compelling the Department to refund the full amount of taxes paid by plaintiffs Granger Land Development Company and Granger Waste Management Company (collectively Granger). On appeal, the primary question is whether the personal property at issue was exempt from Michigan's use tax. Because we conclude that the Court of Claims correctly determined that the property at issue was exempt, we affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. GRANGER'S LANDFILL AND GAS OPERATION

Granger owns and operates landfills. The waste Granger deposits in its landfills generates methane gas as it decomposes. In addition, the landfills generate significant amounts of wastewater as rainfall and other naturally occurring sources of water seep through the

waste deposited in the landfills. This wastewater is known as leachate. Under existing pollution control laws, Granger must monitor and control both the gas and leachate generated as part of its landfill operations.

In a typical landfill operation, the landfill operator will monitor the gas levels and react to unsafe levels as needed, which may include burning the gas off. Likewise, in a typical operation, the operator will capture the leachate and send it to a wastewater plant for treatment. However, Granger does not operate the landfills at issue in a typical fashion. Rather, Granger takes steps to encourage the decomposition process in order to generate gas with a particular composition. Granger recovers the gas and then sells it to a related company, which burns the gas to generate electricity. The related company then sells the electricity to a local utility. Granger also captures the leachate generated in the landfill and circulates it back into the landfill, which further promotes gas production.

In order to meet its pollution control and gas production needs, Granger establishes landfill cells for the waste. A cell consists of an impermeable barrier that is placed on an area of land that may span several acres. Granger establishes the barrier to ensure that liquids do not contaminate groundwater and to facilitate the capture and circulation of leachate. Granger will then place uniform layers of solid waste on the barrier. Before placing the waste in a cell, Granger uses heavy machinery to crush and compact the waste. This processing ensures that the solid waste is relatively uniform and anoxic, which encourages the anaerobic decomposition of the waste. Granger then uses loaders and bulldozers to distribute the waste uniformly in the cell.

As the solid waste accumulates in the cell, Granger lays pipelines—referred to as horizontal wells—at vari-

ous levels within the cell, including the bottom-most layer. The horizontal wells are protected from the weight of subsequent layers of solid waste and the compactor by spreading tire chips over the piping. The tire chips also serve to create a pathway for gas in the event that some piping is accidentally crushed. Granger uses the horizontal wells to capture the gas generated during decomposition and to capture and circulate leachate. Granger connects the horizontal wells to a system that both transports the recovered gas and monitors it for the composition necessary to burn it efficiently. As required by law, Granger also installs vertical wells within the cells in order to monitor gas levels.

Granger uses bulldozers and other equipment to construct the cells. Granger also sprays an organic cover over the cells to prevent the solid waste from blowing away between deposits and to inhibit the escape of gas from the cell or the infiltration of oxygen, which would inhibit the generation of methane gas. Granger also uses the bulldozers to lay gravel for access roads.

When a cell reaches its maximum capacity, Granger caps the cell with nonorganic material to reduce outside air infiltration and improve collection efficiency. Granger then places another impermeable barrier over the cell to prevent the escape of gas and the entry of water. Finally, Granger covers the barrier with two feet of soil and plants vegetation to prevent erosion. Even after Granger caps a cell, it will continue to monitor and recover gas from the cell. A typical cell has a lifespan of 60 to 75 years before being closed and will continue to generate gas for another 30 years after being closed. Although Granger has excavated the waste left after a cell ceases to generate commercial levels of gas in order to recover the horizontal wells and reuse the cell, it does not routinely do so.

B. PROCEDURAL HISTORY

In January 2005, the Department audited Granger's landfill operations. The Department determined that Granger's operation of the landfills constituted the design, construction, or maintenance of real property and did not involve the use of processing equipment. For that reason, it determined that Granger must pay sales or use tax on the materials and equipment—such as the tire shreds, gravel, liners, piping, and bulldozers—that it used or consumed during the operation of its landfills from May 2000 to January 2004. The Department determined that Granger Land Development Company owed $194,296.02 in taxes and that Granger Waste Management Company owed $84,069.32 in taxes. After making adjustments for various exemptions, the Department revised the assessments to $141,549 for Granger Land Development Company and to $5,858 for Granger Waste Management Company. Granger paid these assessments under protest.

In April 2005, Granger sued the Department for a refund of the assessments that it paid for the period at issue. In its complaint, Granger alleged, in part, that the materials and equipment that it used or consumed were used or consumed as part of an industrial process; namely, the processing of solid waste to generate gas. Because it used or consumed the materials and equipment as part of an industrial process, Granger argued that it was entitled to the exemption from sales and use taxation applicable to materials and equipment used in industrial processing.

In response, the Department argued that the materials and equipment were not used in an industrial process or, in the alternative, that they were nevertheless not entitled to the exemption because the materials

were incorporated into real property and the equipment was used to groom real property.

After a bench trial, the Court of Claims determined that the creation and maintenance of the landfill cells constituted an industrial process. It further determined that Granger did not affix the cells, including all the components of the cells, to its real property and did not intend that the cells become part of its real property. Accordingly, the Court of Claims concluded that the materials used or consumed in the creation of the cells qualified for the industrial process exemption. It also concluded that Granger did not use its heavy equipment, such as the bulldozers at issue, to design, construct, or maintain real property, but rather used the equipment as part of an industrial process. For these reasons, the Court of Claims determined that Granger was entitled to the industrial processing exemption for all the property at issue and ordered the Department to refund Granger's tax payments.

This appeal followed.

## II. THE INDUSTRIAL PROCESS EXEMPTION

### A. STANDARD OF REVIEW

On appeal, the Department argues that the Court of Claims erred when it determined that the personal property at issue was exempt from taxation under the Use Tax Act, MCL 205.91 *et seq*. Specifically, the Department argues that the property used or consumed in the construction of Granger's landfill cells is not exempt because Granger affixes the personal property to its real property. Similarly, the Department argues that Granger uses the bulldozers and other heavy equipment to design or maintain the landfills and, for that reason, the equipment is also not exempt.

This Court reviews de novo the proper interpretation of statutes such as the Use Tax Act. *AutoAlliance Int'l, Inc v Dep't of Treasury*, 282 Mich App 492, 499; 766 NW2d 1 (2009).

B. MICHIGAN'S USE TAX

The Michigan Legislature has imposed a use tax on consumers for the "privilege of using, storing, or consuming tangible personal property in this state . . . ." MCL 205.93(1); see *World Book, Inc v Dep't of Treasury*, 459 Mich 403, 408; 590 NW2d 293 (1999). The provisions of the Use Tax Act complement those of the General Sales Tax Act, MCL 205.51 *et seq.*, and were generally designed to avoid the imposition of both use and sales tax on the same property. *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144, 153 n 19, 153-154; 549 NW2d 837 (1996). The Legislature also sought to avoid multiple layers of taxation—referred to as pyramiding—by exempting property used or consumed in the production of goods that will ultimately be subject to a use or sales tax when purchased by consumers. *Id.* at 152.[1] Accordingly, the use tax does not apply to property sold to an "industrial processor for use or consumption in industrial processing." MCL 205.94o(1)(a).

On appeal, the Department does not challenge whether Granger engaged in industrial processing during the relevant taxing period.[2] For that reason, we shall assume that the erection and maintenance of landfill cells—including the modification of the waste

---

[1] The industrial processing exemption has existed since at least 1939 in both the General Sales Tax Act and the Use Tax Act. See 1939 PA 313, §1(b) and 1937 PA 94, §4(g).

[2] Industrial processing means "the activity of converting or conditioning tangible personal property by changing the form, composition,

stored in the cells—for the production and capture of methane gas constitutes industrial processing.[3] See MCL 205.94o(3); MCL 205.94o(7)(a). The Department does, however, challenge whether Granger's use of various materials and machinery during any industrial processing should be excluded from the use tax under the industrial processing exemption. Specifically, the Department argues that Granger affixes the personal property that it uses in the erection and maintenance of its landfill cells to real property and, for that reason the property so used is excluded from exemption under the industrial processing exemption. See MCL 205.94o(4)(d); MCL 205.94o(5)(a). Similarly, the Department argues that Granger uses the bulldozers and other heavy machinery to design, engineer, construct, or maintain real property, which are activities that are specifically excluded from the definition of industrial processing. See MCL 205.94o(6)(d).

### C. PERSONAL PROPERTY AFFIXED AND BECOMING PART OF REAL ESTATE

Beginning with the enactment of 1939 PA 313, the exemption for personal property used or consumed during industrial processing has been defined to exclude personal property that is permanently affixed to, and becomes a structural part of, real estate. See *R C Mahon Co v Dep't of Revenue*, 306 Mich 660, 663; 11 NW2d 280 (1943). Under the modern Use Tax Act, this exclusion from exemption is codified at both MCL 205.94o(4)(d) and MCL 205.94o(5)(a). MCL 205.94o(4)(d) provides that property that is eligible

---

quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail." MCL 205.94o(7)(a).

[3] The Department also limits its analysis to application of the Use Tax Act. Therefore, we shall limit our analysis accordingly.

for an industrial processing exemption includes "[t]angible personal property, not permanently affixed and not becoming a structural part of real estate, that becomes a part of, or is used and consumed in installation and maintenance of, systems used for an industrial processing activity." Similarly, MCL 205.94o(5)(a) provides that personal property that is not eligible for an industrial processing exemption includes "[t]angible personal property permanently affixed and becoming a structural part of real estate . . . ." Construing these statutory provisions together, see *Dep't of Labor & Economic Growth v Dykstra*, 283 Mich App 212, 225; 771 NW2d 423 (2009), it is plain that the industrial processing exemption does not apply to tangible personal property that both is permanently affixed to and becomes a structural part of real estate—even if the personal property is otherwise used in industrial processing. Accordingly, we must determine whether Granger permanently affixed the personal property it used in the erection and maintenance of its landfill cells to real estate and whether the personal property so affixed became a structural part of the real estate.

There are innumerable ways that a person can affix personal property to real estate; some items may be physically attached to the real estate whereas other items may be put in place with the intent that the property will become part of the real estate through its size and character. See, e.g., *Velmer v Baraga Area Schools*, 430 Mich 385, 395; 424 NW2d 770 (1988) (noting that the milling machine at issue was constructively "affixed" to the real property by reason of its weight). Although there is no bright-line test for determining whether and when an item of personal property has become sufficiently connected with real property that it should be treated as part of the real estate,

Michigan courts have traditionally examined all the relevant factors to determine on a case-by-case basis whether personal property has become sufficiently affixed to real property that it should be treated as a part of the real estate. See *Tuinier v Bedford Charter Twp*, 235 Mich App 663, 668; 599 NW2d 116 (1999). Thus, Michigan courts will examine

> (1) whether the property was actually or constructively annexed to the real estate; (2) whether the property was adapted or applied to the use or purpose of that part of the realty to which the property in question is connected or appropriated; and (3) whether the property owner intended to make the property a permanent accession to the realty. [*Id.*]

Determining whether Granger actually or constructively annexed its landfill cells to the real estate is somewhat complicated by the scale of the processing activity at issue—the sizeable area involved, the depth of the cells, and the decades throughout which the processing activity occurs. It is perhaps counterintuitive to entertain the idea that, under some factual scenarios, the waste deposited in a landfill to a depth of tens of feet and spanning several acres might not be constructively annexed to the underlying real estate, especially considering that Granger admitted that the cells would remain in place for decades. Indeed, if Granger were bringing in similar volumes of soil to fill low areas and shape its property in order to facilitate the property's use for a particular purpose over the same time span, one might readily conclude that the fill became part of the real estate by virtue of its volume and character. However, under the unique facts of this case, we conclude that Granger did not actually or constructively annex the cells or their components to its real property.

In order to generate methane gas, Granger must process the waste somewhere. And, given the volume of the material used, the nature of the process itself,

and the time span involved, it is impractical for Granger to process the waste in a traditional manufacturing facility. For that reason, Granger processes the waste in landfill cells that it constructs over time for that purpose. Although the cells are erected on Granger's land, Granger takes no affirmative steps to actually attach the cells to its real property. Likewise, even though the enormous mass of waste material involved implicates constructive annexation, Granger takes significant steps to insulate the waste from the underlying real property. Granger takes these steps to prevent the waste from contaminating the real property and to facilitate the decomposition process that generates the gas. Indeed, even after it caps a cell, Granger continues to monitor and control the gas production within the cell and may later connect the cell to newly established adjacent cells. The erection of independent cells facilitates both the processing and storage of the raw material used in the industrial process—in this case waste. See MCL 205.94o(3)(k) (defining industrial processing to include the storage of in-process materials). Moreover, there is no evidence that Granger erects the cells in order to improve the land or make it more valuable in and of itself; rather, Granger erects the cells to facilitate the processing of waste material into gas that it can sell to third parties. Given these unique facts, we conclude that Granger has neither actually nor constructively attached the landfill cells to its real property.

For the same reasons, we conclude that the erection and maintenance of the cells does not amount to an adaptation of the land under the second test. Granger adapts the land to facilitate the erection of cells; it does not erect the cells to facilitate the use of the land.

Finally, although there is evidence that the cells could remain in place indefinitely, it does not necessarily follow that Granger intended the erection of the cells to be an accession to the real estate. During their commercial lifespan, Granger intends the cells to generate gas and, for that reason, maintains the cells as separate processing units. Further, the fact that cells might conceivably remain in place indefinitely—even after the expiration of their commercial life—does not alter this conclusion. Rather, the abandonment of the cells on Granger's property at some future point in time would be akin to the onsite disposal of waste products by a traditional manufacturer. See, e.g., *Minnaert v Dep't of Revenue*, 366 Mich 117, 122-123; 113 NW2d 868 (1962). The fact that Granger processes its raw material on the same location that it might eventually dispose of the waste material left over after processing does not mean that the materials used in the cells became part of the real estate during the period of processing; Granger intends to use and actually uses the raw material and personal property as part of its industrial process. And, if the waste material left after Granger finishes its processing does become constructively annexed to the real estate at some future point, that fact does not render the personal property consumed in the processing subject to the use tax.

The Court of Claims correctly determined that the materials used to erect the cells at issue were exempt from use tax as property used or consumed in industrial processing.[4]

---

[4] We also find it noteworthy that our resolution of this issue prevents the type of pyramiding that the Legislature intended to alleviate by enacting an industrial processing exemption. *Elias Bros Restaurants, Inc*, 452 Mich at 152.

### D. PERSONAL PROPERTY USED TO DESIGN, ENGINEER, CONSTRUCT, OR MAINTAIN REAL PROPERTY

Industrial processing is broadly defined to apply to the conversion or conditioning of personal property rather than real property. See MCL 205.94o(7)(a). Additionally, MCL 205.94o(6)(d) clarifies that industrial processing does not include activities involving the "[d]esign, engineering, construction, or maintenance of real property . . . ." Therefore, personal property used or consumed in the design, engineering, construction, or maintenance of real property will not fall within the exemption applicable to personal property used or consumed during industrial processing.

In this case, Granger uses bulldozers, compactors, and Trashmasters to process the waste used in the cells. Granger sorts and compacts the waste in order to make it as uniform as possible and to remove pockets of air. It then uses the machines to transport and spread the waste within the cells. Granger also uses the bulldozers to make it possible to access the cells during the period within which the cells are actively being filled and to erect the structural components of the cells. As we have already noted, the individual cells and their internal components do not become a part of the real estate during the cells' commercial life. Because Granger uses the heavy equipment at issue to physically transport and process the waste and to erect the cells, the heavy machinery is clearly being used as part of the industrial processing of the waste and not to design, engineer, construct, or maintain real property. See MCL 205.94o(3)(f) (defining industrial processing to include the design, construction, or maintenance of production); MCL 205.94o(4)(b) (defining exempt property to include machinery used in an industrial processing activity); MCL 205.94o(4)(f) (defining exempt property to include machinery used to move property in

the process of production). Consequently, the Court of Claims did not err when it determined that the heavy machinery was also exempt from use tax.

### III. CONCLUSION

The Court of Claims did not err when it determined that the personal property at issue was not subject to Michigan's use tax. Accordingly, the Court of Claims did not err when it ordered the Department to refund the use taxes paid by Granger.

Affirmed.