KELLY, J.
(dissenting). I respectfully dissent from the majority’s conclusion that plaintiff, Detroit Edison Company (DTE), engages in industrial processing after electric power leaves its plants. While DTE engages in industrial processing when, at the plant, it takes in raw materials and transforms those raw materials into electric power,[1] industrial processing ends once the electric power leaves the plant. Electric power generated at the power plant is distributed through the electric grid. "While its voltage is adjusted as it travels through the electric grid, the “thing” produced— electric power—is not. Like ordinary industrial goods *57 that are packaged for efficiency, DTE transmits the same electric power on high voltage wires to reach customers.
As a result, I would hold that because the electric power does not change after it leaves DTE’s production facility, it is a finished good at that time. Because DTE’s shipping and distribution of electricity does not constitute industrial processing, it is not entitled to the industrial-processing exemption for equipment located outside its production facilities. For these reasons I would not address the issue of apportionment, as it is not necessary in this case. Instead, I would reverse the Court of Appeals, vacate the judgment of the Court of Claims, and remand this case to the Court of Claims for further proceedings.
I. LEGAL ANALYSIS AND APPLICATION
The Michigan Use Tax Act, MCL 205.91 et seq., imposes a tax on every person “for the privilege of using, storing, or consuming tangible personal property in this state at a rate equal to 6% of the price of the property.”[2] MCL 205.94o(l)(a) provides the general rule that the use tax “does not apply to property sold to” “[a]n industrial processor for use or consumption in industrial processing.”
MCL 205.94o both defines “industrial processing” and provides specific examples of what activities are included and excluded from that definition. Subsection (7)(a) defines “industrial processing” as
the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product *58 to be ultimately sold at retail or affixed to and made a structural part of real estate located in another state. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.
Subsection (6)(b) specifies, in relevant part, that industrial processing does not include [s]ales, distribution, warehousing, shipping, or advertising activities.” Subsection (3)(d) in turn provides that industrial processing includes, among other activities, “ [inspection, quality control, or testing to determine whether particular units of materials or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage.” This Court has clarified that “to determine whether the industrial processing exemption applies [in a particular case], it is necessary to consider the activity in which the equipment is engaged and not the character of the equipment-owner’s business.”[3]
Producing and transmitting electricity requires an integrated, interrelated, and interconnected system that includes generation plants, substations, transmission lines, distribution systems, transformers, and meters spread over a large geographic area, known as the electric system. Typically, electricity is first produced by converting raw materials such as coal, oil, or natural gas into heat. That heat then boils water to form steam, which turns a turbine shaft connected to a generator.[4] “[A] generator is a magnet spinning inside *59 a coil of wire,” inducing an electric current in the coil.[5] Defendant, the Department of Treasury (the Department), concedes, and I agree, that this process constitutes industrial processing.
The Department, however, maintains that DTE’s subsequent activity—transmitting and distributing electricity—is not “industrial processing” under the plain language of MCL 205.94o. Rather, industrial processing ends when transmitting and distributing begin, whether the consumer good is electricity or any other product. In contrast, DTE claims that the exemption applies to property used up to the point when finished goods arrive at inventory storage, which, it argues, occurs when the electricity enters into a customer’s meter. To determine which interpretation controls, this Court must determine the Legislature’s intended scope of the industrial-processing exemption as applied to the production of electricity.
A. DEFINITION OF INDUSTRIAL PROCESSING
The Legislature presumably had the basics of industrial processing in mind when crafting the industrial-processing exemption. Raw materials are brought into a production facility and then used to create a good by “ ‘a process of manufacturing, development, [and] preparation for the market.’ ”[6] The newly produced good must then be transported to a retailer or customer. Typically, a definite and distinct point in time delineates when the manufacturer ceases production of a good and begins distribution. Once distribution *60 begins, the manufacturer cannot claim the industrial-processing exemption for property that it uses in that activity.
While electric power does not seem to fit neatly within this description of manufacturing, DTE creates electricity using raw materials, and this newly created electricity leaves the power plant destined for end users. While electricity cannot be packed into a shipping container and delivered on a truck or train, as many consumer goods can be, the General Sales Tax Act[7] nevertheless recognizes electricity as tangible personal property.[8]
DTE argues that industrial processing is clearly defined in the statute and is not complete until its good, electricity, is in its final form, usable by and ready for sale to the customer.[9] It claims that equipment located outside the generation plant converts, conditions, and changes the character of the electricity and that this process is necessary before the electricity is ready for customers. DTE claims that the character of electricity is constantly changing during this phase.
Contrary to DTE’s claims, power that has left DTE’s plants does not change in “form, composition, quality, combination, or character . . . ,”[10] The Court of Appeals erred when it overemphasized DTE’s claim that the electricity is not in its final, safe form until it reaches customers. DTE creates a consumable good, electricity, and as with any good, DTE requires a means to *61 distribute and transport this good to its customers. While the electricity’s voltage happens to be reduced during the distribution process for purposes of efficiency, the fundamental nature of the electric power never changes. On this point, the expert testimony proffered by the Department is instructive: “Through the use of transformers stepping up and stepping down the voltage, the composition and character of the electricity is not changed.”[11] While transformers assist in distributing, transmitting, and delivering electricity to DTE’s customers, they do not alter the nature, composition, or character of electric power initially generated at a power plant. Producing electricity at a high voltage rate allows DTE to supply its product more efficiently across further distances, thus allowing it to create a larger customer base. The purpose of what DTE claims as industrial processing is, therefore, simply a means of distributing its product—electric power—most efficiently, not a means of producing a different product.[12] Indeed, as “[t]angible personal *62 property used or consumed for the preservation or maintenance of a finished good,” the equipment DTE uses to preserve and maintain the flow of energy is explicitly excluded from the definition of industrial processing.[13]
Electric power is a good capable of sale, but it must be transmitted to customers like any other good. The fundamental nature of electricity—the flow of electrons—is not fundamentally altered after leaving the production facility.
B. SPECIFIC EXCLUSIONS FROM “INDUSTRIAL PROCESSING”
This conclusion finds further support in MCL 205.94o(6)(b), under which the Legislature specifically excluded certain activities, including “[s]ales, distribution, warehousing, shipping, or advertising activities,” from the industrial-processing exemption. Additionally, as noted earlier in this opinion, MCL 205.94o(5)(i) excludes “[t]angible personal property used or consumed for the preservation or maintenance of a finished good.”
The Department maintains that industrial processing does not include the activity of conveying a product to a customer through shipping or distribution.[14] In *63 deed, even if an activity would otherwise qualify as “industrial processing” under the statutory definition of that term, when an enumerated exclusion applies, the activity is not considered industrial processing for purposes of the exemption.[15] This is consistent with the rule of statutory construction that, when a general statutory definition conflicts with a specific modifier of that definition, the specific modifier trumps the general definition.[16]
Because distribution and shipping are not defined in the statute, each term must be given its plain meaning.[17] “Shipping” is defined as “[t]he act or business of transporting goods.”[18] “Distribution” is a derivation of the verb “distribute,” which means “[t]o divide and dispense in portions; parcel out.”[19] Therefore, relevant to this case, shipping and distribution refer to the transmission of goods from an industrial processor to the consumer.
Because both distribution and shipping are excluded from the definition of industrial processing, activity occurring after the production of a good is not part of the industrial processing of that good. I agree with the Department that electricity is a vendible good when it leaves the production facility because it is capable of sale at that point. Therefore, the equipment used by DTE to convey that vendible good from its plants to its customers does not qualify for the industrial-processing *64 exemption. Once the electricity leaves its plants, DTE delivers its product. The power lines and equipment outside its plants are simply the means by which DTE delivers the electric power that has been generated at its plants.
C. SPECIFIC INCLUSIONS IN “INDUSTRIAL PROCESSING”
Nevertheless, DTE argues that it is engaged in activities that are specifically included in the statutory definition of industrial processing: inspection, quality control, and testing. While the Court of Appeals and the majority in this Court have accepted this argument, I do not.
MCL 205.94o(3)(d) specifically includes within the industrial-processing exemption equipment used for “[i]nspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage.” Neither DTE nor the Court of Appeals has accounted for the fact that the electricity is a vendible good as soon as it leaves the production facility. To be included within the definition of “industrial processing” for purposes of the exemption, MCL 205.94o(3)(d) requires that the “[inspection, quality control, or testing” occur “before materials or products first come to rest in finished goods inventory storage.”[20] The presence or absence of a physical storage location is not dispositive of whether an activity meets the requirement of MCL 205.94o(3)(d).
The majority sidesteps the fact that electricity never comes to “rest.” Indeed, DTE’s own expert stated that *65 the inspection, quality control, and testing occur after the electricity leaves the plant simply because it promotes the efficient distribution of DTE’s product: “It is not practical under the laws of physics ... for generation plants to produce electricity at the 120/240 volt level as it would require a wire that is 46 [times] greater in circumference than what is available.” The changes to the voltage, therefore, make it efficient to distribute electricity; they do not affect the production of electricity or the quantum of power generated that leaves the power plant. It is that amount that is quantified to determine the power plant’s output and must be considered the fixed goods inventory storage as contemplated in MCL 205.94o.
The majority denies that electricity comes to rest in a finished goods inventory storage at any point. I disagree. The phrase “finished goods inventory storage” must be interpreted in the context of how electricity is actually produced and distributed. While electric power never “comes to rest” at all, the statute does not require goods to be stored in a physical or fixed location before being considered ready for distribution. Rather, the goods must reach a point at which shipping and distribution are appropriate. Consider, hypothetically, a widget that is produced on a conveyor belt that empties into a waiting delivery truck, which then leaves the facility the moment the widget is placed in the truck. Under this circumstance, industrial processing ceases when the widget is placed on the truck, even though it never comes to rest in a physical storage location before distribution. It is logical to reach the same conclusion here, given that the Legislature defined “tangible personal property” to include electricity. It is appropriate to judge DTE’s activities by demarcating the line separating the production of electricity *66 from distribution to consumers.[21]
Because DTE only engages in shipping and distributing electricity once the electricity leaves its production facilities, it does not use any property in industrial processing outside its production facilities under the industrial-processing exemption. Therefore, all equipment used in transmitting and distributing electric power outside its generating plants is subject to the use tax.[22]
II. CONCLUSION
The majority characterizes changes in the voltage of electricity as industrial processing. I disagree. Changes in voltage merely affect the form in which electric power is distributed. DTE only transmits electricity at high voltages to provide for its efficient distribution. DTE is free to choose the most appropriate manner in which to send its product to customers. But that choice does not qualify it for the industrial-processing exemption with regard to the property used in carrying out that choice.
As the Department concedes, DTE engages in industrial processing inside its power plants when it uses industrial machinery to produce electricity. It is therefore entitled to the industrial-processing exemption from the use tax on property used during that process. However, once the electricity leaves DTE’s power *67 plants, the electricity is, and must be, consumed by the end users to whom it is distributed. Personal property used during this distribution process is therefore beyond the scope of the industrial-processing exemption and is subject to the use tax. I would thus hold that DTE may not claim any use-tax exemption for personal property used to distribute and transport electricity from its plants to customers. Therefore, I respectfully dissent and instead would reverse the Court of Appeals’ judgment that DTE is entitled to an industrial-processing exemption for equipment located outside its production facilities, vacate the judgment of the Court of Claims, and remand this case to the Court of Claims for further proceedings.
ZAHRA. and MCCORMACK, JJ., concurred with KELLY, J.

 Electric power generated at a plant is measured in wattage. See 2 Shorter Oxford English Dictionary (6th ed) (defining “wattage” as “an amount of electrical power”). That the primary function of plants is to generate power is reflected in the commonly used term “power plant.”

 MCL 205.93(1).

 Elias Bros Restaurants, Inc v Treasury Dep’t, 452 Mich 144, 157; 549 NW2d 837 (1996).

 Barnett & Bjornsgaard, Electric Power Generation: A Nontechnical Guide (Tulsa: PennWell Publishing Co, 2000), p 112.

 Id. at 101.

 Bay Bottled Gas Co v Dep’t of Revenue, 344 Mich 326, 330; 74 NW2d 37 (1965), quoting Moore v Farmers Mut Mfg & Ginning Co, 51 Ariz 378, 382; 77 P2d 209 (1938).

 MCL 205.51 et seq.

 MCL 205.51a(q) (“ ‘Tangible personal property’ means personal property that can be seen, weighed, measured, felt, or touched or that is in any other manner perceptible to the senses and includes electricity, water, gas, steam, and prewritten computer software.”).

 See MCL 205.94o(7).

 MCL 205.94o(7)(a).

 See also Detroit Edison Co v Dep’t of Treasury, 303 Mich App 612, 616; 844 NW2d 198 (2014). The majority cites caselaw holding that milk pasteurization qualifies as industrial processing for purposes of the use-tax exemption and suggests that the same principle applies to electric power. See Mich Allied Dairy Ass’n v State Bd of Tax Admin, 302 Mich 643, 648-650; 5 NW2d 516 (1942). Unlike milk pasteurization before distribution, however, altering the voltage of electricity during the distribution process does not alter its composition or character. Rather, DTE made a business decision to step down the voltage of electricity in distributing it to customers, while Michigan law requires milk producers to pasteurize milk, a complex process which by its very nature is intended to change the composition and character of the product before it is offered for sale. See MCL 288.538.

 Other producers of electricity confirm that electricity is substantially unchanged after it leaves the production facility. See Kentucky Association of Electric Cooperatives, Inc., How is Electricity Generated & Distributed? <http://www.kaec.org/energy/articlel.htm> (accessed June 19, 2015) [http://perma.cc/J9X3-S5UC] (“Once the turbines gen *62 erate the electricity, its voltage is significantly increased” before it is “routed onto a network of high-voltage transmission lines capable of efficiently transporting electricity over long distances.”); General Electric, Electricity 101 ■— Learn the Basics of Production <https://powergen.gepower.com/plan-build/tools-resources/ power-generation-basics/electricity-101.html> (accessed June 19, 2015) [http:// perma.cc/95UD-MQD3] (“Thick wires carry the electric current from the generator to a transformer, which increases the voltage of the electric current to 500,000 volts or more, before electricity can be sent to the power grid.”).

 MCL 205.94o(5)(i) (emphasis added).

 See MCL 205.94o(6)(b).

 Granger Land Dev Co v Dep’t of Treasury, 286 Mich App 601, 608-610; 780 NW2d 611 (2009).

 Evanston YMCA Camp v State Tax Comm, 369 Mich 1, 8; 118 NW2d 818 (1962).

 Haynes v Neshewat, 477 Mich 29, 36; 729 NW2d 488 (2007).

 The American Heritage Dictionary of the English Language, New College Edition (1981).

 Id.

 Emphasis added.

 While I conclude that apportionment is not necessary, because no industrial processing occurs after electricity leaves DTE’s production facilities, nothing in this opinion would preclude apportionment if necessary.

 Because I conclude that none of DTE’s property outside its production facilities is exempt for purposes of the industrial-processing exemption, I do not consider how to apportion the exemption between exempt uses of the property and nonexempt uses under MCL 205.94o(2).